# Richmond

## AKERS ROARK V. COMMONWEALTH OF VIRGINIA.

January 24, 1944.

Record No. 2767.

Present, Campbell, C. J., and Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*T. L. Hutton* and *H. E. Widener*, for the plaintiff in error.

*Abram P. Staples, Attorney General*, and *M. Ray Doubles, Assistant Attorney General*, for the Commonwealth.

HUDGINS, J., delivered the opinion of the court.

Akers Roark, who operated taxicabs in Abingdon, Virginia, was indicted for murder, found guilty of involuntary manslaughter and sentenced to three years' confinement in the penitentiary.

On the morning of April 22, 1943, he talked with H. W. Williams, a citizen of Russell county, who was then in Abingdon *en route* to West Jefferson, North Carolina, approximately sixty miles away. Williams told Roark that he had missed train connections in Abingdon and asked the price of continuing by taxicab. Roark replied that he would take him to his destination for $20. Williams seemed to think that the charge was too high and left Roark. Later in the day W. R. Perkins, who was a stranger to Williams but the father of Roark's first wife, introduced himself to Williams. Williams told Perkins that he had missed his train and had considered taking a taxicab. About noon Williams saw Roark sitting in a taxicab, parked on Wall street in front of the bus station, and again discussed transportation by taxicab to West Jefferson. Perkins walked up and said that Williams, by taking a four-thirty bus out of Abingdon, could make train connections to West Jefferson. Roark said he could not. Williams decided to make further inquiries in the bus station and walked across the sidewalk. Roark and Perkins continued the argument. Roark was heard to say, "You don't know a God damned thing about what you are talking about." Perkins called Roark a "lying son-of-a-bitch." Thereupon Roark struck Perkins with his left fist and knocked him down on the sidewalk. When Roark saw that Perkins was unable to rise, he lifted him off the sidewalk, obtained water, bathed his face and sent for a doctor. The doctor made a hasty examination, observed blood oozing out of his ears and directed that Perkins be taken to a hospital. Roark placed Perkins in his taxicab, carried him to the hospital and agreed to pay the medical and hospital bills. Perkins died that evening at seven-fifteen. The X-rays showed two fractures of the skull less than half an inch apart extending about six inches

over the left ear. All of the doctors stated that death resulted from the fractures and that the fractures were the result of the fall on the sidewalk and not the blow.

The evidence further shows that there was no antecedent grudge nor any hard feelings between Perkins and Roark, that they were on very friendly terms, and that Roark had frequently taken Perkins from Abingdon to his home in Damascus without charge.

There is no substantial conflict in the evidence as stated, but there is a sharp difference in the Commonwealth's theory of the case and the theory of the defendant. The Commonwealth's theory is set forth in eight instructions requested and given over the objection of the defendant. They read:

"I. The court instructs the jury that every homicide in Virginia is presumed, in the absence of other evidence, to be murder of the second degree and in order to elevate the offense to murder in the first degree the burden is upon the Commonwealth and in order to reduce the offense to manslaughter, or to show a justification or excuse for the killing, the burden is upon the accused to introduce evidence to show extenuating circumstances or justification, unless it appears from the evidence of the Commonwealth. It is, however, the duty of the jury to consider all of the testimony no matter by whom introduced, and to ascertain therefrom if the accused is guilty or innocent, and if guilty of what offense.

"II. The court instructs the jury that to constitute deliberate and premeditated killing—murder in the first degree—it is not necessary that the intention exist for any particular length of time prior to the actual killing, it being only necessary that such intention should come into existence for the first time at the time of the killing or any time previously.

. "III. The court instructs the jury that before you can find the prisoner guilty of either first or second degree murder you must believe the assault on Perkins was made

maliciously, but the court further tells you that malice may be either express or implied. Implied malice is where there is no mind and formed design to take life, but where the killing, nevertheless, is done without justification or excuse, and without provocation, or without sufficient provocation to reduce the offense to manslaughter, and it is for you to say whether the assault was made with malice.

"IV-A. The court instructs the jury that a man is presumed to intend to do that which is the immediate and necessary consequence of his act.

"V. The court instructs the jury that words, however grievous, will not justify an assault.

"VII-A. The court instructs the jury that involuntary manslaughter is the unlawful killing of a human being without malice, either express or implied, and without intent to kill or inflict the injury causing death, committed accidentally in the commission of some unlawful act not felonious.

"VIII. The court instructs the jury that the jury are the sole judges of the weight to be given the evidence, and of the credibility of the witnesses who testified, and in determining the weight to be given the evidence of the witnesses, and the credibility of the witness, the jury may take into consideration the witnesses' demeanor on the witness stand, their manner of testifying, their motive, if any shown, for testifying as they do, and their interest, if any is shown, to testify as they do, and their interest, if any is shown, in the result of this trial. And the jury may take into consideration anything else affecting the credibility of the witnesses, and give such weight to their testimony as the jury believe it is entitled to.

"IX. The court instructs the jury that if you find the prisoner guilty, your verdict must state whether you find him guilty of murder,—voluntary manslaughter,—involuntary manslaughter,—or an assault and you must fix his punishment accordingly.

"If you find him guilty of murder in the first degree, you will fix his punishment by death or by confinement in

the penitentiary for life or for any term not less than twenty years.

"If you find him guilty of murder in the second degree you will fix his punishment at not less than five years nor more than twenty years in the penitentiary.

"If you find him guilty of voluntary manslaughter you will fix his punishment at not less than one nor more than five years in the penitentiary.

"If you find him guilty of involuntary manslaughter you will fix his punishment at not less than one nor more than five years in the penitentiary, or in your discretion, a fine of not more than $1,000.00 or confinement in jail not more than one year, or both.

"If you find him guilty of an assault you will fix his punishment at a fine of not more than $500.00 or not more than twelve months in jail, either or both."

Defendant's theory was, and is, that a simple assault was the highest offense of which he could be convicted on the evidence. This theory was embraced in numerous instructions tendered, all of which were refused. The trial court committed no error in refusing the instructions requested by defendant, as the evidence for the Commonwealth shows that Perkins' death resulted from an unlawful but not felonious act of defendant.

The jury rejected the theory of the Commonwealth, acquitted the defendant of murder in either degree, as well as voluntary manslaughter, and found him guilty of the lowest punishable grade of homicide. Hence, the precise question presented is not whether the evidence is sufficient to sustain a conviction of murder in either degree, but whether the giving of any instruction defining the two degrees of murder was reversible error. Defendant conceded that the instructions to which he objected state correctly abstract principles of law, but contends that it was reversible error to give them in this case as the evidence was not sufficient to establish either express or implied malice, the distinguishing element between murder and manslaughter.

The Attorney General, in his able brief, contends that, on the evidence, the jury had a right to imply malice and find the accused guilty of murder in the second degree. The evidence upon which this contention is based is as to the force of the blow and the disparity in size and strength of the parties. Several of the witnesses for the Commonwealth stated that Perkins was knocked backwards and that his head struck the pavement while his feet were still in the air. The defendant was a young man 35 years of age and apparently strong. Perkins was an elderly man 59 years of age, 5 feet 7 inches in height, weighing only 135 pounds. At the time of the homicide he was not in good health and had just recovered from an attack of influenza. It was apparent to the defendant that he had been drinking.

Ordinarily, the fist is not regarded as a dangerous or deadly weapon. Hence, usually, death is not held to be a natural and probable result of a blow with the bare fist. Under ordinary circumstances no malice may be inferred from such a blow even though death results. 26 Am. Jur. 361; *People* v. *Crenshaw*, 298 Ill. 412, 131 N. E. 576, 15 A. L. R. 671. However, an assault with the bare fists may be attended with such circumstances of violence and brutality that an intent to kill will be presumed.

In *M'Whirt's Case*, 3 Gratt. (44 Va.) 594, 611, 46 Am. Dec. 196, this is said: "The fists may not, indeed, be regarded generally, as a deadly weapon; but they become most deadly, by blows often repeated, long continued, and applied to vital and delicate parts of the body of a defenceless, unresisting man, on the ground. And if to the injury they are capable of producing, when wielded by a strong man, you add all the accompanying injuries which the more powerful agency of stamping the party on the ground may inflict, there might be strong ground to infer the intention not merely to cause great bodily harm, but even death itself." See the dissenting opinion in *McAndrews* v. *People*, 71 Colo. 542, 208 P. 486, 24 A. L. R. 655; *Commonwealth* v. *Lisowski*, 274 Pa. 222, 117 A. 794; *State* v. *John*, 172

Mo. 220, 72 S. W. 525, 95 Am. St. Rep. 513; *State* v. *Hyland*, 144 Mo. 302, 46 S. W. 195; *Thomas* v. *Commonwealth*, 27 Ky. L. Rep. 794, 86 S. W. 694; *Maulding* v. *Commonwealth*, 172 Ky. 370, 189 S. W. 251; *Commonwealth* v. *Fox*, 7 Gray (73 Mass.) 585.

In *State* v. *John, supra*, at page 227, this is said: "A strong brawny man will not be allowed to approach an unoffending citizen in a public highway and deal him a deadly blow with his fist in a vital part and when death, the natural censequence of his act, ensues, be heard to say that he merely intended to punish him and not to kill him. The facts of this case disclose unmitigated brutality, conduct much in keeping with the business in which defendant was engaged."

But the facts in this case do not bring it within these last stated principles. The uncontradicted evidence is that there was no antecedent grudge, that there were no threats, and that the defendant and Perkins had always been on friendly terms. Defendant stated that when Perkins injected himself into a business discussion which did not concern him and then called him vile names, "it just made me mad * * * and I forgot myself." The defendant gave this account of the incident: "Mr. Perkins walked up in my face and said, 'you can't tell a man a lie and get his money.' I said, 'Mr. Perkins, you don't know anything about this. We can't take him no way. We can't go but ten miles.' And he said, 'just trying to mix a man up and get his money for nothing.' I said, 'the bus leaves at four-thirty. He can make better time.' He said, 'you are just a God damned son-of-a-bitch. It goes at five o'clock.' And he repeated that a couple of times and I asked him to get on out of my face. I said, 'go on and get away, you don't know anything about the taxi business.' He repeated it and I just about half smacked him with a shove and he fell back and hit the sidewalk."

Several witnesses for the Commonwealth stated that the defendant hit Perkins with his fist and not with his open

hand, as he claimed. However, all the eye-witnesses said that the slap or blow was made with the left hand and defendant was right-handed.

While we have repeatedly held that mere words, however grievous, will not justify an assault, it is natural for a normal person to resent the use of vile epithets in regard to himself or a close relative, and, when grossly insulting words provoke a simple assault, they may be and should be considered in mitigation of punishment. The relation of the parties, the facts leading up to the blow, the use of the left hand or fist, and the acts of defendant immediately after the blow clearly show that defendant did not intend to inflict serious bodily injury upon deceased. Under these circumstances, no malice can reasonably be inferred from proof of the killing.

The general rule in this jurisdiction is that malice may be presumed from proof of killing when such proof is unaccompanied with circumstances of palliation. The burden of disproving such malice is upon the accused, but, as Mr. Chief Justice Campbell said in *Brown* v. *Commonwealth*, 138 Va. 807, 813, 122 S. E. 421, as a general proposition such an instruction is proper. "The test, however, as to the correctness of the instruction * * * is whether or not there was any theory, either presumptive or otherwise, which warranted the trial court in giving this instruction to the jury."

The pertinent part of instruction I, given for the Commonwealth, reads: "The court instructs the jury that every homicide in Virginia is presumed, *in the absence of other evidence*, to be murder of the second degree," etc. (Italics supplied.) "Other evidence" was not absent in this case as the Commonwealth, in proving the homicide, established the circumstances under which the blow was struck. From these circumstances no reasonable inference of malice could be drawn.

The Attorney General contends that even if the giving of instructions I, II, III, IV-A and IX was error, it was

harmless because the jury acquitted the defendant of murder in either degree and voluntary manslaughter. There are a number of authorities holding that any error, in giving or refusing instructions as to degrees of homicide higher than that of which the accused was convicted, is harmless. Among such authorities is 21 Cyc. 1098; 30 C. J. 445. Other authorities are collected in Am. Dig., Dec. ed., Homicide, Key No. 340(4).

In *Jarrell* v. *Commonwealth*, 132 Va. 551, 566, 110 S. E. 430, we said: "But if there had been error in these instructions with respect to the subject of murder in the first degree, as the jury found the accused guilty only of murder in the second degree, and thereby acquitted him of murder in the first degree, such error would have been harmless, unless there were some special circumstances indicating that the jury were influenced in their verdict by the errors with respect to the defining of murder in the first degree." See also, *Collins* v. *Commonwealth*, 134 Va. 540, 543, 113 S. E. 717.

In many cases the principles for which the Attorney General contends would be controlling, but the peculiar facts and circumstances under which this case was tried indicate that the instructions were prejudicial to defendant. Five of the eight instructions for the Commonwealth, based upon murder in the first degree, murder in the second degree and the presumption of malice implied from proof of killing, were calculated to impress the jury with the gravity of the offense out of proportion to the crime established by the testimony. Defendant entered strenuous objection to each of these instructions. He had a right to a fair trial with the atmosphere free from an erroneous view of the character of the crime and the extent of its punishment.

The erroneous view of the character of the crime and the prejudicial atmosphere in which the jury were compelled to consider the evidence were aggravated by the closing argument of the Commonwealth attorney, wherein he said: "Now, they (attorneys for the defendant) would

ridicule the idea of this man being guilty of murder because they say he had no intent or no malice. I assume, Gentlemen, that you understand if the evidence would not permit it, or if you didn't have a right to consider it, that the court would never have instructed you about those things. So I assume that there is nothing preposterous or foreign as Mr. Hutton—"

Objection to the remarks was overruled.

The Commonwealth attorney continued: "The court did instruct, you can find him guilty of murder, and I take it if you could not have the court wouldn't have so instructed you."

The court, in overruling the objection, said: "I overrule the motion, and I am going to say to the jury this: 'Gentlemen, you know what the evidence was and you are bound by the evidence. You are the sole judges of it, and you know what the instructions are. That is the law. You are governed by the law and the evidence, that is the instructions and the evidence, and I can't control everything that counsel on either side say. They are arguing the case, and you are bound by those instructions and the evidence as it is here.' "

■ The giving of the instructions on murder was error. The remarks of the Commonwealth attorney and the court stressed this error. The only inference to be drawn from the instructions and the remarks is that, in the opinion of the Commonwealth attorney and the court, the evidence justified the jury in returning a verdict of murder in the first degree and fixing the punishment of this prisoner at death. The fact that the jury rejected the theory of the prosecution and acquitted the defendant of murder, in either the first or the second degree, and voluntary manslaughter, and found him guilty only of involuntary manslaughter, under the circumstances of this case, does not make the giving of the instructions and the argument which the Commonwealth attorney was permitted to make to the jury harmless error.

In view of the provision of Code 1919, sec. 4918 (limiting the offense for which defendant can be tried again to involuntary manslaughter), it is useless to discuss the other assignments of error.

For the reasons stated herein, the judgment of the trial court is reversed, the verdict of the jury set aside, and the cause remanded for a new trial in accordance with the views expressed herein.

*Reversed and remanded.*