# Richmond

## CECIL RILEY WHITE v. COMMONWEALTH OF VIRGINIA.

March 4, 1946.

Record No. 3042.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Browning and Spratley, JJ.

The opinion states the case.

*Tom E. Gilman* and *James G. Martin & Son*, for the plaintiff in error.

*Abram P. Staples, Attorney General*, and *M. Ray Doubles, Assistant Attorney General*, for the Commonwealth.

BROWNING, J., delivered the opinion of the court.

Cecil Riley White shot and killed Russell King on the afternoon of May 2, 1944, about 5:00 o'clock. The shooting happened just outside of the front entrance door of what is known as the Kozy Korner Restaurant in Norfolk County, Virginia. There were a number of eyewitnesses, on both the inside and outside of the restaurant, to the facts which led up to the tragedy. The testimony of these witnesses is in irreconcilable conflict.

The accused had known the deceased since 1936. In 1937 they became estranged. In that year the accused had been injured in an accident, out of which grew his suit for damages, which were laid at $50,000.00. The deceased was a witness in the case and testified adversely to the claim of the accused. White lost the suit; and Mrs. Dorothy Winfree,

who was a defendant, and who was a witness in this case, testified that he said in the court room on the afternoon of the trial that he would get even with King sooner or later. White admitted in answer to a question propounded by a juror that he had said to King at the conclusion of the damage suit, "I think you testified mighty dirty towards a brother longshoreman." He further said that King cursed him and threatened to do him bodily harm. Thus, that there was bad feeling between them is an established fact.

On the inside of the restaurant seated in a booth were a man named Whitehurst and a Miss Turner, who were having some beer. White, who was a watchman at a railroad crossing nearby, came into the restaurant with a sailor and joined the two persons referred to in the booth, he drinking Coca Colas rather than beer. The deceased, about 5:00 o'clock P. M., drove up with four other men and parked their automobile in front of the restaurant and went in and were drinking beer at the counter. It is fairly clear that the deceased went over to the booth and engaged in conversation with the accused. Charlie Bateman, who happened in the restaurant to get a sandwich, testified that he heard White tell King, "If you don't get out of here, I am going to kill you." He further testified that King started out and the accused followed him, saying, "I said I am going to kill you and I will do it." They went out of the front door, when the witness heard three or four shots. The following examination of the witness, Walter Snowden, took place:

"Q. Did you see anything that took place between this man who was killed and Mr. Cecil White inside of that Kozy Korner before the shooting took place?

"A. I was over there at Chris' and he was making me a barbecue sandwich and I heard somebody say, 'Get out of here,' and I looked around and seen Popeye, and I got up out of the seat and started out of the door and Cecil put his hand on his breast and give him a little shove and he fell down and his head hit the door.

"Q. Whose head hit the door?

"A. King's.

"Q.   Mr. White gave him a shove in his breast?

"A.   A little shove in his breast with his hand.

"Q.   Did he shove him towards the door?

"A.   King was turning around, and so he got up out of his seat and King walked out and did not say a word.

"Q.   What did White do then?

"A.   Come back and leaned up against the table where he was sitting at a couple of second.

"Q.   What?

"A.   Come back and leaned up against the table where he was sitting at.

"Q.   He did not follow Mr. King out at that time?

"A.   No, Sir.

"Q.   Did you see Mr. White leave the Kozy Korner, the inside of it?

"A.   I saw him when he started towards the door.

"Q.   When he started towards the door, where was Mr. King then, Popeye?

"A.   On the outside.

"Q.   How long was that before the shooting?

"A.   About a couple of seconds.

"Q.   Did Mr. White have a gun in his hand then?

"A.   He had one in his hand when he got up at the table.

"Q.   Did you see where he got that gun?

"A.   No, Sir, I did not."

King, the deceased, it will be noted, was familiarly called "Popeye."

Bateman and Snowden, extracts from whose testimony have been quoted, so far as evidence discloses, were disinterested eyewitnesses to the beginning of the incidents leading to the shooting.

Dr. L. C. Ferebee, the coroner, said that his autopsy showed that King had been shot four times, two of which entered the shoulder at the back, one entered from the side at the left groin, the other went through the front of the leg and out.   The Commonwealth's testimony strongly tended to show that the assailant stood over his victim while he was

down and shot him, as we have said, in the back of the shoulder.

Of course, parts of the testimony for the accused were in direct conflict with much of that of the Commonwealth.

For example, the accused testified that the deceased attacked him and that as the proprietor of the restaurant leaned over to clear away a table which had been in use, he saw a pistol in his hip pocket which he snatched and used in defense of himself.

A number of witnesses testified that the proprietor was behind his counter at the time and that they did not see the accused take a pistol from his pocket, though the proprietor corroborated the accused, but it later appeared in the evidence that the accused was an intimate friend of the proprietor and sometimes helped him serve his customers. This naturally weakens the testimony referred to. It will be noted that Bateman testified that he saw the accused had a pistol when he got up from his seat at the booth.

In accordance with the familiar rule we have stated the facts in the light most favorable to the Commonwealth, the accused having been convicted by the jury of murder in the second degree and given a term of five years in the penitentiary, which was approved by the court.

The judge and the jury heard the evidence, saw the witnesses and noted their manner and demeanor: The jury's verdict, approved by the court, is binding upon this court unless we can say there was bias or prejudice or some sinister element which influenced the verdict.

The accused assigned errors assailing the verdict as contrary to the law and evidence and alleging error on the part of the court in granting six of the instructions asked for by the Commonwealth and refusing four asked for by the defense.

To quote all of these instructions which are brought into question and to discuss them singly would unduly lengthen this opinion and serve no good purpose. The jury was fully and properly instructed. We may give some extended notice

to Instruction No. 9 which was asked for by the defense and refused by the court. It is this:

"The jury are further instructed that in determining the question of whether King intended and endeavored to inflict great bodily harm upon the defendant, they may take into consideration, not only the acts of King on the occasion in question, but also his language which accompanied said acts."

We think the court was clearly right in refusing this instruction. It is objectionable for several reasons. It is not supported by the evidence. It selects certain parts of the testimony which it emphasizes and it seems to stem from a strained and warped conception of the holding of this court in the case of *Roark* v. *Commonwealth*, 182 Va. 244, 28 S. E. (2d) 693, in which we said through Mr. Justice Hudgins:

"While we have repeatedly held that mere words, however grievous, will not justify an assault, it is natural for a normal person to resent the use of vile epithets in regard to himself or a close relation, and, when grossly insulting words provoke a simple assault, they may be and should be' considered in mitigation of punishment."

The facts in the case here and those in the *Roark Case* are so entirely dissimilar as to make any citation from that case, as relevant to this, inapt and unadaptable. In that case the two men, Roark and Perkins, the deceased, had all along been friends—there was no grudge or ill feeling between them —a hasty epithet of a rude and brutal nature, uttered in the heat of an animated and acrimonious discussion, induced a blow by Roark, with his left hand or fist, which felled Perkins to the pavement, his head striking the hard surface, fracturing his skull in two places from which he died.

There was a rather close family connection between the two men and immediately after the blow Roark lifted Perkins off the sidewalk, bathed his face and sent for a doctor, who directed that he be taken to a hospital. Roark placed Perkins in his taxicab, carried him to a hospital and agreed to pay the medical and hospital bills. This was in contrast with the attitude of White who, after shooting his

victim four times, put his foot on the wrist of the prostrate man, and took a knife out of his hand that forsooth he might have it to show what dire hazard he was in when he committed the crime.

The case at bar reeks with malice, the *Roark Case* is devoid of it. This makes all the difference in the world.

What we said in the *Roark Case* does the established law no violence and therefore there is nothing to clarify. We there simply uttered a truth which finds its genesis in human experience which is back of all things. The statement was well warranted by the facts, there appearing, and became the law of that case.

The objections to the instructions on the degrees of murder are not impressive as being of serious moment.

Upon the Commonwealth's evidence the jury could have rendered a lawful verdict of murder in the first degree.

The jury was lenient with the accused.

We may say with reference to the urged error of the court in refusing Instruction No. 7, asked for by the defendant, that we think the court was plainly right.

■ The instruction dealt with the question of reasonable doubt with regard to the proof. The defendant's Instruction No. 15, which was granted, covered the subject completely, and it was useless, and might have been confusing, to have issued another on the same subject.

The instruction, however, had specific reference to one isolated feature of the trial, namely, the indictment.

It is urged that the jury should have been told that the indictment did not raise the slightest presumption of guilt against the accused.

■ That is true, of course, but as was suggested by the Attorney General, the defendant was not entitled to have a separate instruction with reference to every incident of the trial.

Again defendant's Instruction No. 15 covered the doctrine of the presumption of innocence which answered the purpose of No. 7.

■ No exception was taken to the fact that the indictment was signed by the attorney for the Commonwealth and therefore it is not an issue but we wish to say that we do not think it a good practice and it should be avoided.

The judgment of the court is affirmed.

*Affirmed.*