# Richmond

ALBERT WOODLEY PERKINS v. COMMONWEALTH
OF VIRGINIA.

October 13, 1947.

Record No. 3269.

Present, *Hudgins, C. J., and Gregory, Eggleston, Spratley and
Buchanan, JJ.

*Note.—Former Chief Justice Holt sat during the argument of this case
and before his death concurred in this opinion.

The opinion states the case.

*Broudy & Broudy* and *Eugene Diggs*, for the plaintiff in error.

*Abram P. Staples, Attorney General*, and *Henry T. Wickham* for the Commonwealth.

EGGLESTON, J., delivered the opinion of the court.

Albert Woodley Perkins, a Negro, was indicted for the murder of Forest R. Briese, an enlisted man in the United States Navy. He was tried by a jury, convicted of voluntary manslaughter, and his punishment fixed at three years in the penitentiary. To review the judgment entered upon that verdict the present writ of error has been allowed.

At the time of the alleged offense the accused was employed as a waiter in a petty officers' club on Boush street, in the business district of the city of Norfolk. His duties required that he remain at the club until after midnight. For his protection he had procured from the proper authorities a permit to carry a pistol.

About one o'clock in the morning of July 30, 1946, Perkins left the club for his home, on Charlotte street,

some seven blocks from the place of his employment. He walked northwardly along Boush street, thence eastwardly along Freemason street, across Granby street, on which are located the principal retail stores in the city, and across Monticello avenue and Brewer street toward Bank street. Bank street runs north and south and intersects Charlotte street near Perkins' home.

J. E. Stevenson, a taxicab driver, the principal witness for the Commonwealth, gave this version of the shooting: While he was seated in his taxicab which was parked on the south side of Freemason street, headed eastwardly toward Bank street, he heard an argument between two men on the left and to the rear of his cab. Upon getting out of the cab he saw Perkins walking eastwardly along the north side of Freemason street toward Bank street. Briese was following Perkins, but was on the opposite or southern side of Freemason street. Stevenson said he heard Briese say to Perkins: "Give it back to me and everything will be all right," to which Perkins replied: "I won't give it back," or words to that effect. Upon closer observation Stevenson saw that Perkins had a pistol in his hand. Perkins then reversed his course and began to walk rapidly westwardly toward Brewer street. Briese followed, repeating his request: "Give it back to me," to which Perkins again replied, refusing to do so. The couple disappeared around the corner, Perkins going northwardly along the eastern side of Brewer street, followed by Briese. Stevenson followed at a safe distance. Perkins then ran up on the porch of premises number 422 Brewer street, where he rang the bell and knocked on the door, apparently in the effort to arouse the occupants of the house.

It later developed that the house to which Perkins sought admittance was occupied by the Jarvis family who were intimate friends of his. Although the occupants heard the noise and commotion on the porch, they did not respond immediately.

In the meantime Briese started up the steps toward Perkins who stood on the porch with the pistol in his hand. Despite

Stevenson's warning, Briese proceeded up the steps, again saying to Perkins: "Give it back to me and everything is going to be all right." Perkins' reply was: "Don't come up these steps or I will shoot you. Don't take another step." Briese replied: "You won't shoot me. I am a customer of yours," and continued up the steps, holding out his hand toward Perkins and saying: "Give it back to me." When Briese reached the top step Perkins fired two shots and Briese slumped to the floor of the porch, mortally wounded. Perkins ran from the scene.

Perkins' account of what took place is substantially this: As he was walking along Freemason street, between Granby street and Monticello avenue, he was accosted by Briese who inquired: "Where is a good hotel?" to which he (Perkins) replied: "I don't know no hotel," and proceeded on his way. Briese followed him, insisting: "Say, Nigger, Nigger, where in hell is a good hotel?" Perkins made no reply but increased his pace along Freemason street, across Brewer street, toward Bank street. As he approached the intersection of Freemason and Bank streets the sailor, who had continued to follow him, was joined by Stevenson, the taxicab driver. When the two men closed in on him, Perkins turned and ran westwardly along Freemason street and around the corner of Brewer street to the Jarvis porch, with the two men in pursuit. Being unable to arouse his friends by ringing the bell and knocking on the door, he pointed the pistol at Briese, the nearest of his pursuers, warning him: "Don't come up here or I will shoot; don't come up here or I will shoot." Briese started up the steps, saying: "Nigger, give me that pistol; don't I will kill you." Despite his (Perkins') repeated warnings, Briese continued up the steps and struck him (Perkins). Whereupon he (Perkins) fired the two fatal shots.

Perkins insisted that he had had no prior dealings of any character with Briese; that he had previously seen neither Briese nor Stevenson, the taxicab driver; and that when they pursued him he thought that they intended either to beat or rob him.

The evidence further shows that Perkins is fifty-five years of age, of slight build, and weighs only 135 pounds. Briese was a large man, thirty years of age, over six feet in height, and weighing about 185 pounds.

There is no merit, we think, in the contention that the verdict finding the accused guilty of voluntary manslaughter is not supported by the evidence, and that this is a case of justifiable homicide requiring the acquittal of the accused.

According to the Commonwealth's evidence, which the jury has accepted, there was nothing to warrant the accused in apprehending that he was in danger of death or great bodily harm at the hands of Briese. Briese committed no overt act to indicate this. He was unarmed. He did not strike the accused or threaten violence to him.

It is plain from the conversation which took place between the parties, as detailed by Stevenson, that Briese thought, as the result of some transaction which he had had with the accused, that the latter was withholding from him (Briese) something to which he (Briese) was entitled. According to Stevenson's story, Briese was not undertaking to maintain his rights by force. On the contrary, Briese was supplicating or begging in a friendly manner for the return of that to which he thought he was entitled.

It is true that the accused may have misunderstood and feared Briese's motive and intent, but bare fear of injury at the hands of another, in the absence of some overt act indicative of imminent danger at that time, will not justify the taking of human life. *Stoneman* v. *Commonwealth*, 25 Gratt. (66 Va.) 887; *Mercer* v. *Commonwealth*, 150 Va. 588, 597, 142 S. E. 369; *Vlastaris* v. *Commonwealth*, 164 Va. 647, 651, 652, 178 S. E. 775, 776.

Indeed, the court, without the objection of the accused, so instructed the jury here, who, by their verdict, found that there was no such overt act on the part of Briese.

The next assignment is that the lower court erred in granting the usual instructions defining and distinguishing between murder in the first and second degrees and out-

lining the measure of punishment for each. It is argued that in no event would the jury have been justified in finding the accused guilty of murder, and hence all instructions on the subject were prejudicial under the principles laid down in *Roark v. Commonwealth,* 182 Va. 244, 28· S. E. (2d) 693.

In that case the deceased was killed by a blow of the bare fist, struck under circumstances, established by the Commonwealth's evidence, from which, as we said (182 Va., at page 252, 28 S. E. (2d), at page 697), "no reasonable inference of malice could be drawn." In this situation we held that instructions dealing with the two degrees of murder should not have been given.

In the case before us the killing was with a deadly weapon, in the previous possession of the slayer, and, according to the evidence of the Commonwealth, without any or upon very slight provocation. We have repeatedly held that under such circumstances the homicide is *"prima facie* wilful, deliberate, and premeditated," and "throws upon the accused the necessity of proving extenuating circumstances." *Scott* v. *Commonwealth,* 143 Va. 510, 518, 129 S. E. 360. See also, *Thomas* v. *Commonwealth, ante,* pp. 131, 137, 41 S. E. (2d) 476, 479.

Under this principle it was proper to have granted the instructions complained of.

Complaint is made of the ruling of the lower court in refusing to grant Instruction D-3 which reads thus:

"The court instructs the jury if you believe from the evidence that the deceased was the aggressor and made an attack upon the accused, in such a manner or under such circumstances as to furnish reasonable grounds for apprehending a design for doing him some serious bodily harm, and the accused reasonably and honestly believed that such danger was imminent, then under the law of self-defense, he had the authority to determine from appearances and, from the actual circumstances with which he was then confronted, to act upon such appearances and, without retreating, shoot his assailant, if he reasonably and honestly

believed that such shooting was necessary to avoid the apparent danger of serious bodily harm, and the homicide arising out of such shooting is deemed in law to be justifiable, even though the jury may determine from their own viewpoint that such shooting was not, in fact, necessary to repel the attack. For when one attempts to injure another, by a sudden and unprovoked attack, the party attacked has the right to make use of such means to prevent injury as the behavior of his assailant and the immediate situation reasonably make necessary."

The purport of this instruction was to submit to the jury whether the accused should have been acquitted on the theory that the killing was justifiable in self-defense, as indicated by his own testimony.

According to the story of the accused, Briese, who was a total stranger, accosted him on the street and without justification began to insult him. In order to avoid trouble he tried to run away from Briese, but his escape was blocked by Briese and the taxicab driver, both of whom chased him and caused him to seek refuge at the Jarvis home. Being unable to arouse the occupants of the Jarvis household, he displayed his pistol and warned Briese not to come up on the porch after him. Despite this warning, Briese advanced upon the accused and struck him. The accused, believing that he was in great danger of serious bodily injury or death at the hands of his assailant, fired the fatal shots.

In the light of this testimony the accused was entitled to an instruction which submitted to the jury whether or not Briese had been the aggressor, that is, had brought on the controversy, and whether he had made an attack upon the accused in such a manner or under such circumstances as to furnish reasonable grounds for apprehending a purpose to do him (the accused) some serious bodily harm, and if so, what were the legal rights of the accused under such circumstances.

None of the other instructions granted presented these precise features for the consideration of the jury.

The Commonwealth's reply to this assignment is that the instruction does not correctly state the principles applicable to a case of justifiable homicide in self-defense in that it omits the important qualification that the accused himself must have been without fault in bringing on the difficulty.

It is true that in order for a homicide to be "justifiable," as distinguished from "excusable," the accused must have been entirely free from fault in bringing on the controversy. *Dodson* v. *Commonwealth*, 159 Va. 976, 979-984, 167 S. E. 260; *Hale* v. *Commonwealth*, 165 Va. 808, 813, 814, 183 S. E. 180, 182.

While the requested instruction might have been clarified in this respect, it substantially embodies the principle contended for by the Commonwealth. The jury were told that the principles enunciated were applicable if they believed from the evidence that "the deceased was the aggressor."

In 3 C. J. S., p. 350, an "aggressor" is defined as: "One who begins a quarrel or dispute; one who brings on a conflict or affray by some overt act or demonstration calculated to precipitate the difficulty or conflict; one who provokes a difficulty."

While the jury may have inferred from the conversation between the deceased and the accused, as detailed by the Commonwealth's witness, that the accused and the deceased had had some prior transaction, as the result of which the accused was at fault in withholding something from the deceased, to which the latter was entitled, and that the accused had thus brought on the controversy, the testimony of the accused himself is directly to the contrary. His testimony is that no such transaction or conversation occurred between him and the deceased, that they were total strangers to one another, and that the deceased was the aggressor.

The credibility of the story of the accused was for the jury, and he was entitled to have had his theory of the case presented to them under a proper instruction or instructions.

Complaint is made that the lower court refused to grant Instruction D-7 which told the jury that "in determining whether or not the accused *thought* he was in great bodily harm at the hands of the deceased, the jury may consider

the relative strength, size and age of the parties, along with all the other facts and circumstances presented in the case." (Emphasis supplied.)

The instruction, as phrased, was properly refused. In determining whether the accused had the right to shoot the deceased in self-defense, the test is not whether the accused *thought* or *believed* at the time of the killing that he was in imminent danger of great bodily harm at the hands of the deceased. He must have believed and must have had reasonable ground to believe, at the time, that he was in such danger. *Ballard* v. *Commonwealth*, 156 Va. 980, 1005, 159 S. E. 222; *Taylor* v. *Commonwealth*, 185 Va. 224, 227, 228, 38 S. E. (2d) 440, 441, 442. The court so instructed the jury at the request of the accused in Instruction D-4 and in Instruction D-5.

For the error of the lower court in refusing to grant Instruction D-3 the judgment is reversed and the case is remanded for a new trial.

*Reversed and remanded.*