# Richmond

JOE HENRY v. COMMONWEALTH OF VIRGINIA.

October 12, 1953.

Record No. 4093.

Present, All the Justices.

The opinion states the case.

*Boucher & Boucher, Fred C. Parks, H. E. Widener* and *H. E. Widener, Jr.,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *Francis C. Lee, Assistant Attorney General,* for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

Joe Henry was at the May, 1952, term of the Circuit Court of Washington County, indicted for the murder of Ralph Shaw. He was tried on June 14, 1952, and the jury found him guilty of murder in the second degree, and fixed his punishment at fourteen years in the penitentiary. Motion was duly made to set aside the verdict as contrary to the law and the evidence, which motion the trial court took under consideration. Thereafter, the defendant further moved to set aside the verdict and grant him a new trial on the ground of after-discovered evidence. On July 29, 1952, the court overruled both motions, and entered judgment in accordance with the verdict of the jury. Defendant applied for and was granted a writ of error.

The main assignment of error is that the evidence failed to show that the death of Shaw resulted from any criminal act of Joe Henry; and that, therefore, the *corpus delicti* was not proven. In other assignments it is contended that the trial court erred in granting any instruction relative to murder in the first or second degree; in overruling the motion of the defendant to declare a mistrial because of

alleged improper remarks of the trial court; and in refusing to grant a new trial on the ground of after-discovered evidence. The assignments will be taken up in the order named.

The evidence for the Commonwealth and for the defendant is in conflict on several material points. In view of the verdict of the jury, we must consider the evidence in the light most favorable to the Commonwealth. *Leigh v. Commonwealth*, 192 Va. 583, 587, 66 S. E. (2d) 586.

On Saturday, April 5, 1952, Joe Henry was engaged in playing pool in the City Billiard Hall, in Abingdon, Virginia, with James Thomas, James Keith, Ralph Shaw, the deceased, and another young man named Stoddard. At about 4:10 p. m., Henry, in a loud, rough voice, accused Shaw of hitting the wrong ball. About 4:30 p. m., Shaw charged the defendant with making a ball unfairly. Henry called Shaw a "damned liar." Shaw shot one more ball and announced that he was quitting the game. Holding the pool cue in both hands, he started to walk past Henry towards the stick rack to put the cue up. As he came within range of the defendant, Henry pulled out of his right-hand pocket a pair of metal wire cutters, sometimes referred to as pliers, and "swung" them around and hit Shaw. The latter was wearing a "winter cap," and the blow struck him on the left side of his head, about the location of the brim of his cap. Shaw dropped his cue, turned, fell toward the floor; but recovered himself before landing on the floor. He then "staggered" as he passed by Henry, and the latter hit him a second time. Shaw went to the latrine and Henry followed him asking for a drink. Shaw said nothing, shook his head, walked on out of the pool room, and proceeded to another pool room located in the same block around the corner, arriving there at approximately 4:45 p. m. He played two or three games of pool in this room and appeared to be in a more or less dazed condition, saying little or nothing while there. At about 5:30 p. m., he suddenly quit playing, hung his cue stick up, "hollered" three times at the man in charge of the

room, walked out of the door without looking back or paying for the pool game, turned left, and went towards Main street.

Shortly after 5:30 p. m., several witnesses observed Shaw on West Main street, a short distance from the last pool room he visited, clinging to a telephone pole near the curb. He slowly "eased down" beside the pole, falling to the street on his right hip. He held his head up so that it did not strike anything. Several witnesses came to his aid and lifted him to his feet. He showed no bruises or bleeding; but his left leg seemed to be giving him trouble. Unable to talk clearly, the only thing the witnesses understood him to say was that he had lost the use of his leg. They placed him in an automobile and carried him to his home. He had a small quantity of whiskey in a bottle on his person, but no odor of alcohol was detected on his breath. He became unconscious in the car. When he reached home, his family and friends, thinking that he was, perhaps, under the influence of intoxicants, put him to bed. He remained in an unconscious condition until death, which occurred at approximately 5:00 a. m. the following day, April 6, 1952.

Dr. J. S. Shaffer, a practicing physician and the medical examiner for Washington County, examined the body of the decedent on April 6th. His examination at that time revealed no evidence of external abrasions, bruises or injury to his head. There were two or three minor skinned places on his knees.

Hearing that the deceased had been hit in the head, Dr. Shaffer had the body sent to Dr. Thomas G. Scott, a pathologist, to have an autopsy made to determine the cause of death. Dr. Scott performed the autopsy at 8:40 p. m., Monday, April 7, 1952. He explained in detail his examination of the head of the deceased and the conditions he found. He opened the scalp, took off the bone forming the skull cap, and removed the brain. On opening the scalp, the part next to the bone showed some blood in the tissue and in the muscle just above and in front of the left ear. There was a

fracture one and one-fifth inches long with a separation of about one-twenty-fifth of an inch in the squamous or thin part of the temporal bone on the left side. The fracture had "interrupted" the blood vessel and caused a hemorrhage within the skull. There was a recent blood clot amounting to four ounces between the bone of the skull and the membrane where the blood vessel lies. There was also a minor crack over the left eye in the "floor of the skull" that showed some recent bleeding, and another one on the opposite side just in front of the ridge of the temporal bone, but without any accumulation of blood.

Dr. Scott testified that: "The death was due to intra-cranial, increased intra-cranial pressure, that is, pressure within the cranium or skull. * * * Increased pressure displacing the brain by pressure against this membrane that lies over it is the cause of death." He further said the type of hemorrhage found "is always due to trauma or accident or some impact such as we presume occurs in any case of skull fracture;" that the injured person usually remains conscious until the accumulation of blood is of sufficient volume or amount to cause the pressure that finally brings on unconsciousness; and that this sometimes goes on for hours or for several days. He found no wounds about the skin or scalp on the outside surface. There were some small abrasions on the knees, described as superficial scratch marks. Asked how hard a blow it would take to cause the fracture described, he answered that the fracture occurred in the thinnest portion of the skull just in front of the ear and above the temporal ridge; that it depends on how thin the bone is and exactly how the blow is struck, that is, whether it is a glancing or direct blow; and that in his opinion, the death of Shaw was caused by the hemorrhage from the fracture.

Dr. Shaffer examined the brain and skull of the deceased after the autopsy had been performed. He found that: "There was a hemorrhage underneath the scalp on the left temporal region. There was a linear fracture of the left temporal bone and a large area hemorrhage, an epidural

hemorrhage beneath the skull and a very small hemorrhage on the right temporal region." In his opinion, Shaw's death was caused by the "Epidural hemorrhage and fractured skull." He agreed with the findings and conclusions of Dr. Scott, and said that it was possible for a man receiving a blow such as would cause the fracture to remain conscious for some time and live for days or weeks; and that in the examination which he made of the skull he did not find any possible cause of death other than the fracture and hemorrhage which have been described. He could not tell how decedent received the injury to his head; but only knew he had received a blow. He further said that a blood test taken for alcohol at nine o'clock Sunday morning, April 6th, showed a negative result.

The wire cutters in question were found at Henry's home and introduced in evidence. They had been left in the pool room by Henry a day or so before the affray, and had been retaken by him about 11:00 o'clock a. m. on April 5th. They are about eleven inches long, one-half inch thick, and weigh a little more than a pound.

Shaw and Henry had apparently been good friends previously, and had played pool together many times. There was some evidence that they were gambling on the occasion in question, and that both had been drinking, although no one saw Shaw take a drink; but he did have some liquor in his possession. There was other evidence that Shaw was holding the stick up to keep the blows of Henry from striking him, and that there was loud talk and cursing by both of them.

The defendant did not testify. Ed Keith, a witness in his behalf, stated that Shaw cursed Henry and hit him with his cue stick; and that Henry did not strike any blow "except to keep Shaw away." This witness admitted that he was not paying much attention to the parties at the time, and said he did not even see the pliers mentioned. Other witnesses said Shaw was holding his stick with the heavy butt end up in a menacing way as he advanced towards

Henry. There was testimony that Shaw played pool in his usual way in the second pool room.

Dr. E. H. Hearst, a physician engaged in the general practice of medicine, called on behalf of the defendant, testified that he thought that there should have been some visible evidence of injury on the outside of the head of Shaw, if he were struck by the pliers which were in evidence. He also said that he would expect some external evidence of a hematoma or laceration if a man fell and struck his head on the street with sufficient force to produce a fracture of the skull. He was unable to explain the existence of the fracture described and the non-existence of any external injury.

The jury were exhaustively instructed on the principles of law applicable to all phases of the case, nine instructions being granted at the request of the Commonwealth and twelve at the request of the defendant. The instructions defined murder in the first and second degrees; voluntary and involuntary manslaughter; assault; self-defense; the burden and sufficiency of proof; reasonable doubt; malice; sufficiency of provocation; and what constitutes a deadly weapon.

The death and identity of the person alleged to have been murdered were fully proven. The evidence shows that he came to his death as a result of violence, a fractured skull caused by a blow or blows upon his head.

The jury, under proper instructions, found that the pair of wire cutters in evidence before them, when used in the manner in which it was said to have been used, was capable of producing death or great bodily injury. No serious contention is made that it could not be employed as a deadly weapon. Brought before us as an exhibit, its size, shape and weight indicate clearly that it was capable of being so used.

On the question of the criminal agency and the identity of the criminal agent, the evidence therefore shows that the defendant struck the deceased with a deadly weapon; that the impact of the blow or blows was in the region of the

skull where the fracture occurred; and that the sole cause of the death of Shaw was a brain hemorrhage resulting from the fracture of his skull. In other words, there was shown no cause or possible cause of the death of the decedent, other than the fracture received by him at the hands of the defendant. Thus, the *corpus delicti* was fully established. *Terry* v. *Commonwealth*, 171 Va. 505, 198 S. E. 911; *Bowie* v. *Commonwealth*, 184 Va. 381, 35 S. E. (2d) 345.

It is next contended that the evidence did not justify the giving of any instruction defining murder in the first or second degree. It is argued that there was shown no previous grudge between Shaw and Henry; that the alleged blow or blows were struck during a sudden heat of passion growing out of a quarrel or provocation; and that the combat was mutual, and, therefore, the homicide was at most only voluntary or involuntary manslaughter. It was further argued that, if the acts of Henry were the cause of the death of Shaw, the killing was done in justifiable self-defense. In this connection, it is specifically insisted that instructions Numbers 5 and 6-B, considered together, are erroneous. These two instructions read as follows:

"Instruction No. 5. The Court instructs the jury that words, however grievous, will not justify an assault."

"Instruction No. 6-B. The Court instructs the jury that a mortal wound given with a deadly weapon, in the previous possession of the slayer, without any or upon very slight provocation, is *prima facie* wilful, deliberate, and premeditated killing, and throws upon the accused the necessity of proving extenuating circumstances. However, this presumption may be overcome by proof of extenuating circumstances sufficient to create a reasonable doubt in favor of the accused, either as to the degree of the offense or as to his guilt or innocence. And the jury are the judges of whether the weapon used by the defendant in this case is a deadly weapon when used in the manner and under the circumstances in which it was used as disclosed by the evidence."

Instruction No. 5 has been repeatedly approved by this court. *McCoy* v. *Commonwealth*, 125 Va. 771, 775, 99 S. E. 644, 133 Va. 731, 736, 112 S. E. 704; *Harris* v. *Commonwealth*, 134 Va. 688, 114 S. E. 597; *Martin* v. *Commonwealth*, 184 Va. 1009, 1016, 37 S. E. (2d) 43.

Under circumstances similar to those here, we have repeatedly held:

"It is well settled law in this jurisdiction that a mortal wound given with a deadly weapon in the previous possession of the slayer, without any, or upon slight provocation, is *prima facie* willful, deliberate and premeditated killing, and throws upon the accused the necessity of proving extenuating circumstances.

"Every homicide is presumed to be murder in the second degree, and the burden of proving the elements necessary to elevate the crime to murder in the first degree is upon the Commonwealth, and the burden is on the accused to reduce the offense from murder in the second degree to manslaughter or excusable or justifiable homicide." *Leigh* v. *Commonwealth, supra*, 192 Va. at page 590. *Callahan* v. *Commonwealth*, 192 Va. 26, 30, 63 S. E. (2d) 617; *Smith* v. *Commonwealth*, 192 Va. 186, 189, 64 S. E. (2d) 761.

It is also equally well settled that malice may be inferred from the deliberate use of a deadly weapon, in the absence of proof to the contrary, and that unless a weapon is *per se* a deadly one, the jury should determine whether it and the manner of its use place it in that category. *Pannill* v. *Commonwealth*, 185 Va. 244, 253, 254, 38 S. E. (2d) 457; *Floyd* v. *Commonwealth*, 191 Va. 674, 683, 62 S. E. (2d) 6.

As said by Mr. Justice Eggleston in *Callahan* v. *Commonwealth, supra*, 192 Va. at page 31, "Except in cases where the evidence establishes beyond question that the killing was unpremeditated and without malice, the jury should be instructed as to the degrees of homicide and as to the punishment therefor provided by statute. *Bradshaw* v. *Commonwealth*, 174 Va. 391, 401, 4 S. E. (2d) 752, 756."

The facts in the cases of *Roark* v. *Commonwealth*, 182 Va. 244, 28 S. E. (2d) 693 and *Richardson* v. *Commonwealth*, 128 Va. 691, 104 S. E. 788, relied on by the defendant, readily distinguish those cases from this. In the *Roark case*, no deadly weapon was used, and in the *Richardson case* an assault was added to the insults on the defendant.

We find no error in either instruction 5 or 6-B.

In this case, whether the blows of the defendant caused the death of Shaw, whether the defendant was guilty of any offense in striking said blows, and if so, whether his offense was murder, manslaughter, or merely an assault; whether the blows were struck in the course of the sudden quarrel in mutual combat upon provocation, slight or grave; and whether the defendant acted in self-defense, were questions to be determined by the jury.

All of the witnesses, save one, testified that Shaw made no effort to strike Henry. On the other hand, the evidence of the Commonwealth shows that while a bystander tried to prevent Henry from engaging in the affray, Henry continued to press the attack and actually struck Shaw two or more blows. Lack of provocation and lack of mutual combat are thus amply supported. Witnesses often contradict each other and give different versions of the same occurrence. Jurors are not required to accept in full the testimony of any witness. They may accept such as they believe credible, and reject that which they think not worthy of belief. Their duty is to settle the matter in dispute. *Randolph* v. *Commonwealth*, 190 Va. 256, 263, 56 S. E. (2d) 226. Here they have accepted the evidence of the Commonwealth as worthy of belief, and it supports their verdict of murder in the second degree.

During the course of the trial, counsel for the dedefendant asked Dr. Scott, the second witness for the Commonwealth, the following question: "And you can't tell, you don't know what the blow was from or how it was received that caused this fracture, do you?" Dr. Scott replied that it was a hypothetical question, and he had not been

qualified as an expert to answer it. The witness then asked to be excused. Whereupon, the trial judge said to him: "Doctor, just a minute. You could answer if they qualified you?" Dr. Scott replied, "Yes, sir." The trial judge then said: "Now you can ask the question." Counsel for the defendant said: "No, sir. I object to that and except to it."

A motion was made to declare a mistrial on the ground that the remarks of the trial judge were improper and prejudicial. The motion was overruled. The trial judge merely allowed counsel an opportunity to obtain an answer to a question which he had already asked the witness, that is, to get the information he sought. The trial judge expressed no opinion on the matter in issue, and in no wise invaded the province of the jury. Moreover, at the conclusion of all of the evidence, he specifically charged the jury to wholly disregard anything said by him in the above matter and to "wipe it from their minds." We find no prejudicial error.

This brings us to the final contention that the court erred in refusing to set aside the verdict and grant a new trial upon the ground of after-discovered evidence. Defendant offered in support the affidavits of James Keith, Una Keith and Laura Henry.

James Keith had been summoned as a witness for the defense; but the summons was not served because Keith had left the community and his whereabouts was unknown. He returned to Abingdon on or about June 19th or 20th, and on June 23rd, made the affidavit. He stated that he witnessed the difficulty in the first pool room; that Shaw rushed up to Henry with a cue stick in his hand; that when they got close together, he separated them; that Shaw hit at Henry, but he did not know whether the blow landed or not; that Henry made an attempt to hit Shaw with the pliers, but deponent intercepted the blow; and that the participants in the difficulty apparently parted on friendly terms.

Keith said that after the affray, Shaw left the pool room before he did; that he, Keith, went to his home across the railroad tracks and remained there about twenty minutes; that he then returned to town with his mother; that he next saw Shaw in an alley near the railroad tracks, engaged in an "altercation" with a man whom he did not know, but who bore "a familiar face around Abingdon;" that the man struck Shaw "about two times," and Shaw "bounded up against a brick wall there;" that he did not see anything in the hands of the stranger; that he was on the sidewalk where they were fighting, fifteen or more feet distant from them; that he had been drinking and did not go closer because he "was sure the cops would come down" and he did not want to become involved in the difficulty; and that he was unable to fix the time of the day.

Keith also said that after the fight in the alley, Shaw went to the second pool room, and he, Keith, went to the bus station where he stayed about two minutes; that he, Keith, then went to the second pool room and saw Shaw playing pool with somebody; that he did not know how long Shaw stayed in the second pool room, but that was the last time he saw him; and that deponent went back to his home and didn't remember where he went thereafter. Keith further said that he saw Shaw take a drink in the first pool room, and that he later gave him "a shot of whiskey," because Shaw's pint of whiskey had been consumed. He declared that he left home on April 7th to go to Kansas City, and did not hear of Shaw's death until the latter part of May when he got a letter from his father.

Mrs. Una Keith, mother of James, said that on the afternoon of April 5th, sometime after 5:00 o'clock, or maybe 5:30, while accompanying her son, James, to her home, she saw two men who seemed to be fighting at the place located by her son; that the "tall guy hit the short guy twice in the head with his fist;" and that she asked her son who they were, and he said one of them was the man who had had some trouble in a pool room a short time prior

thereto. She thought that the short man fell against a wall and seemed to be hurt.

Laura Henry, sister of the defendant, said that she had no "intimation or reason to have any intimation" that James Keith knew of a fight between Shaw and some person in the alley mentioned until after the return of Keith on June 20th, 1952, four days after her conversation with S. S. Atwell, a deputy sheriff of Washington County; that she and the defendant had heard rumors of such a fight prior to her brother's trial; and that she was unable to ascertain whether the rumors were true until the return of Keith.

Defendant filed an affidavit that he had no knowledge of the alleged attack upon Shaw in the alley until Keith returned to Abingdon.

The Commonwealth offered several affidavits in rebuttal.

S. S. Atwell, the deputy sheriff hereinbefore mentioned, said that two days after the trial of Henry, the latter's sister asked him, in the presence of Henry, whether her brother would be given a new trial if new evidence could be discovered, and he replied that she would have to get the court to pass on that; that Miss Henry then said she had understood that Shaw was seen in a fight with someone else after the fight with Henry; but she could not make any further statement because she had to find out more about it. This was three days before James Keith returned to Abingdon on June 19, 1952. Atwell said that the reputation of James Keith for truth and veracity in his community was bad.

Another deputy sheriff, Elmer Rosenbaum, who was on duty at the jail where the defendant was held as a prisoner, said that on June 19, 1952, James Keith came and asked to see Henry; that the two talked for several minutes in the anteroom of the cell block which adjoins the jail office, and as the door between the rooms was open, he could hear their conversation. He heard the defendant ask Keith if he knew whether Shaw had been in any other fight on the afternoon of April 5, 1952; that Keith replied he did not

know but he would see what he could find out and come back and tell him. At no time during their conversation did Keith say anything about Shaw fighting with anyone else on April 5th.

J. D. Christian, the chief of police of the town of Abingdon, said that the general reputation of James Keith for truth and veracity was bad, and that he would not believe his testimony under oath.

The essential facts necessary to warrant a new trial on the ground of after-discovered evidence have been too often stated in the cases to require repetition. *Nicholas* v. *Commonwealth*, 91 Va. 741, 753, 21 S. E. 364; *Allen* v. *Commonwealth*, 114 Va. 826, 838, 77 S. E. 66; *Shaver* v. *Commonwealth*, 151 Va. 545, 555, 145 S. E. 377; *Pauley* v. *Commonwealth*, 151 Va. 510, 518, 144 S. E. 361; *Hodnett* v. *Danville*, 152 Va. 955, 960, 146 S. E. 281; *McCloud* v. *Va. Elec. & P. Co.*, 164 Va. 604, 609, 180 S. E. 299; *Dickens* v. *Goode*, 186 Va. 388, 393, 42 S. E. (2d) 863; *Moore* v. *Commonwealth*, 186 Va. 453, 464, 42 S. E. (2d) 871; Burks Pleading and Practice, (4th Ed.), page 601; 7th Michie's Digest of Va. and W. Va. Reports, New Trials, 723, and Vol. 5 Permanent Supplement, page 31.

In *Holmes* v. *Commonwealth*, 156 Va. 963, at page 969, 157 S. E. 554, and in *Powell* v. *Commonwealth*, 179 Va. 703, at page 714, 20 S. E. (2d) 536, quoting with approval from 20 R. C. L. 308, we said:

" 'In view of the temptation to obtain a rehearing after an adverse verdict, particularly in a criminal case and in view of the facility with which affidavits for this purpose can be obtained, all such evidence should be scrutinized with the greatest care and caution. It follows, therefore, that where affidavits and other proofs are produced for and against, which are conflicting and contradictory, and of somewhat even balance, so that it requires a precise estimate to determine as to the greatest weight or preponderance, the trial court's conclusions will not be disturbed, unless they result in manifest injustice.' "

As Chief Justice Hudgins said in *Leigh* v. *Commonwealth*, *supra*, 192 Va., at page 597: "Application for a new trial is addressed to the sound discretion of the trial court and is based on the ground that there has not been a fair trial on the merits. The newly discovered evidence in question does not meet two of the four essentials required to sustain a motion for a new trial, namely: such evidence must be material in its object, and as such on another trial ought to produce opposite results on the merits. * * * It must not be merely cumulative, corroborative or collateral."

James Keith, it will be remembered, was a participant in the game of pool with Shaw and Henry in the first pool room at the time of their affray. According to Harold Keith, his brother, he was also in the second pool room with Shaw until Shaw left that room. James lived at the home of his father, Ed Keith, who was a witness for the defendant.

An examination of the statements in support of the motion for a new trial show them to be contradictory, inconsistent and improbable. Witnesses for both the Commonwealth and the defendant testified that Shaw was present at some place other than the alley mentioned, the whole of the afternoon of April 5th, subsequent to his departure from the first pool room. Harold Keith testified that Shaw was playing pool the entire time from 4:45 p. m. to 5:30 p. m. Mrs. Una Keith merely attempts to corroborate her son's statements.

No weapon was seen to be used in the alleged second fight which could have caused the fatal injuries revealed by the autopsy. The medical evidence did not disclose any injuries about the face or head, which could have been caused by blows of the fist. The affidavit of Laura Henry shows that the possible existence of such new evidence was known to her and the defendant prior to the trial, yet no mention was made of it at the trial, or motion for continuance. Over the objection of counsel for the defendant, Ed Keith testified that he had received a letter from his

son, James, about a month before the trial, and that the latter said he was in a hospital.

The strange behavior of James Keith and the circumstances under which his evidence was discovered, and the inconsistencies as to the time and place of the alleged second attack render the affidavits untrustworthy. It is not such evidence as would likely produce a different result on another trial. We are of opinion that it does not measure up to the requirements of the rule justifying the granting of a new trial.

The defendant has been ably represented by counsel of his own choosing. He has had the advantage of every defense provided by law, and has been given a fair and impartial trial. The record amply sustains a conviction of murder in the second degree. We find no error in the rulings of the trial court, and the judgment complained of is affirmed.

*Affirmed.*