## Rex Allen Perricllia

### v.

## Commonwealth of Virginia

Record No. 840352

Decided March 8, 1985, at Richmond

Present: All the Justices

*W. R. Broadwell (Donnie W. Salyers,* on brief), for appellant. *Leah A. Darron, Assistant Attorney General (Gerald L. Baliles, Attorney General; Robert Q. Harris, Assistant Attorney General,* on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

Tried by a jury under an indictment charging him with the first-degree murder of James E. Mercer, Rex Allen Perricllia was found guilty of murder of the second degree. The trial court sentenced him in accordance with the jury verdict to confinement in the penitentiary for 20 years. At trial, Perricllia admitted having shot Mercer but testified that he did so in self-defense. On appeal, Perricllia contends that the evidence was insufficient to support the verdict and that the trial court improperly instructed the jury.

The chief witness for the Commonwealth was Mark Anthony Wilson, age 19, a friend of Mercer. Wilson testified that about 11:15 p.m. on January 28, 1983, he and Mercer were standing on the sidewalk by Mercer's truck, which was parked in the street near Mercer's home in the village of Raven. After consuming two or three drinks of liquor, they decided to walk down the street to the B. P. Club. As they proceeded along the sidewalk, they saw Perricllia in his car turn left from the street and pull slowly into an alley running between an apartment house on one side and a junkyard on the other. The B. P. Club was next to the apartment house. There was no light in the alley, but the area in front of the B. P. Club was lighted.

Wilson testified that the window was down on the driver's side of Perricllia's car and Perricllia mumbled something which Wilson could not understand, but Mercer got "mad." Wilson and Mercer walked over to the car, walking beside the car as it moved slowly down the alley, and Mercer asked Perricllia, "Have you got a problem?" When Mercer repeated the question, Wilson heard Perricllia answer, "No, have you got one?" Mercer said, "You step out of that car, I'll be your problem," or words to that effect. Perricllia, putting his car in "park," replied, "I'll get out of this

car and whip your ass, boy." Wilson said that Perricllia put his hand on the door handle but did not open the door. While Perricllia and Mercer were still "cussing each other," Wilson turned his head toward the B. P. Club for a "split second." When he turned back, he saw flames coming from a firearm, heard three shots, and saw Mercer hold his chest, stagger, and fall against the car. Wilson estimated that he and Mercer were standing about a foot from the car on the driver's side when the shooting occurred. Perricllia drove off; Wilson ran to the B. P. Club for help.

Wilson asserted that there was no one else in the alley at the time of the shooting. He was aware that the alley was the only way to go to Perricllia's house by automobile. He did not see Mercer reach into the car or strike Perricllia, but he conceded that Mercer could have done so while Wilson was looking away. Wilson also conceded that Mercer's voice was threatening "in a way." Wilson was not sure there was going to be a fight, however, because Perricllia would not get out of his car. So far as Wilson knew, Mercer did not have a weapon in his possession.

Lethia Vance, who lived on the second floor of the apartment house overlooking the alley, testified that when she heard voices in the alley she went on her porch in time to hear three shots fired. She saw Perricllia in his car. Mercer, who had been standing on the driver's side, staggered back and fell against a gate behind the car. Rushing to the scene, Vance saw Wilson standing across the alley in the shadow of the junkyard building. Mercer fell close to Wilson. Before the shooting, Vance heard someone ask Perricllia why he did not get out of the car. After the shooting, Vance saw Perricllia drive away.

Geraldine Mercer, the victim's mother, testified that she was at home when the shooting occurred. Her house was across the fence from the junkyard. She heard her son twice tell Perricllia to get out of his car; she then heard Mercer tell him to get out and raise the hood. Going to her porch, which faced the alley, she saw Mercer standing beside the car with his left arm on top of the vehicle. She heard a shot, saw her son turn, and then heard two more shots. She watched as Perricllia drove his car in the alley to the corner beyond the apartment house, turned right, and continued in the alley for a short distance to the place where he parked below his parents' home.

Mrs. Mercer said that her son took Lufyllin, a drug for his asthma, about 6:30 or 7:00 p.m. on January 28. She also said she

did not permit her son to drink alcoholic beverages inside the house; if he engaged in such drinking, he did it outside.

Deputy Sheriff J. A. Barber and Investigator Clarence Tatum, of the Tazewell County Sheriff's Department, were two of the investigating officers. Their testimony established that they went to Perricllia's home, located about 300 yards from the scene of the shooting, about 4:45 a.m. on January 29. Finding Perricllia in bed, they arrested him under a warrant charging him with Mercer's murder. After receiving his *Miranda* warnings, Perricllia stated that he did not know anything about the shooting. Before leaving the house in the custody of the officers, Perricllia woke his mother, informed her that he was charged with murder, and said, "He died." After arriving in Tazewell, Perricllia signed a statement, introduced in evidence, in which he again denied any knowledge of Mercer's shooting.

About 7:40 p.m. on January 29, Perricllia informed Tatum of his desire to give another statement. In this second signed statement, also introduced in evidence, Perricllia said that as he drove into the alley to return home he saw two people. When one yelled something to him, he stopped and rolled down the car window on the driver's side. He recognized Mercer and thought it was Wilson standing nearby. Mercer tried to get Perricllia to leave the car, but he refused to do so. Threatening to drag him out, Mercer reached through the window and hit him below the left eye. Perricllia picked up his father's loaded .22-caliber revolver which was on the seat beside him. Mercer then reached through the window and "grabbed" him by the shirt. Perricllia stated that he was leaning toward the passenger side to get away from Mercer. Fearing for his life, Perricllia pointed the revolver at Mercer and fired probably two or three times, not to kill Mercer but only to "get him off." Perricllia did not know whether any of the shots had struck Mercer, but he drove home and told his parents what had happened.

At the time the second statement was taken, Perricllia tried to show Tatum a place on the left side of his face where he said Mercer had hit him, but Tatum was unable to see any mark or bruise.

Dr. Mario Stefanini testified that he examined Mercer's body at 12:10 a.m. on January 29, and an autopsy was conducted later that morning. The autopsy revealed that Mercer, 24 at the time of his death, had been shot three times, once in his right arm and

twice in his torso. A blood-alcohol test conducted at the time of the initial examination revealed an alcohol level of .163 per cent and the presence of Amitriptyline, also known as Elavil, a drug occasionally prescribed to relieve the anxiety of asthma. Dr. Stefanini testified that alcohol and Elavil do not have a synergistic effect upon each other, *i.e.,* the combination of the two does not intensify the effect of either. The autopsy report showed a blood-alcohol level of .15 per cent under a test conducted at the Bureau of Forensic Science in Roanoke.

The evidence was undisputed that one bullet entered Mercer's chest and descended at a 45-degree angle through his left lung, liver, stomach, and pancreas. A residue of powder was found on the left front of Mercer's jacket where this bullet passed through; tests indicated that the bullet was fired from a distance of 12 to 24 inches. Another bullet entered Mercer's back and moved upward through his left lung and heart; according to Dr. Stefanini, this bullet caused the most damaging of the three wounds. There was no evidence as to the order in which the shots were fired.

When presentation of the Commonwealth's evidence had been completed, Perricllia moved to strike the evidence as insufficient. On the basis of the testimony of Wilson and Mrs. Mercer, the trial court denied the motion.

Deputy Sheriff Barber, called as a witness for Perricllia, testified that Perricllia did not have a reputation in the community of being a violent person.

Perricllia attempted to show that Mercer's mother, contrary to her testimony, could not have seen the shooting from her porch because bags of aluminum cans stacked against the fence in the junkyard and vines on the fence would have obstructed her view. Jim Lawson, operator of the junkyard, testifying for the defendant, stated that he had hauled several loads of cans to the property and sometimes stacked them to a height of seven or eight feet next to the six-foot chain link fence. However, he could not say how high the bags were stacked on the night of the shooting. He also testified that there were no leaves on the vines and rose bushes growing along the fence around the property.

Perricllia's parents, Louis and Reba, testified as witnesses for their son. Louis testified that he was in bed on the night of January 28 when he heard "hollering and whooping" outside. Going to the front door, he switched on the light as his son's car approached pursued by four or five persons, one of whom looked like

Wilson. Perricllia entered the house, went into his mother's room, examined the side of his head, and said, "They knocked me in the head down there and tried to pull me out of my car." Reba put rubbing alcohol on a red place on her son's head. When they saw the rescue squad "over there," Perricllia told his father that he "might have hit one of them," but he never identified the person he might have hit. Louis said Perricllia had been "packing" a firearm about five years and for a year and a half had been carrying the .22-caliber revolver wherever he went. Louis said he and his son did not go to bed until 3:00 or 4:00 a.m.; the police arrived after 4:00 a.m. The next morning, according to Louis, he went to the scene of the shooting, saw bags of cans in piles three or four feet higher than the fence around the junkyard, and was certain that they prevented Mercer's mother from seeing the shooting.

Reba Perricllia confirmed her husband's testimony that she put rubbing alcohol on a red place, which she estimated was the size of a 50-cent piece, on the left side of Perricllia's head. She believed her son told her that night that he had shot someone in the arm.

Perricllia, 28, unmarried and unemployed, testified in his own behalf. He acknowledged having lied to the investigating officers when he denied any knowledge of the shooting, but he said that he lied because he was scared. He had not had anything alcoholic to drink on January 28 or for more than a year prior to that date. He said that the second signed statement he gave to Tatum was a correct summary of the events of January 28.

Perricllia related that he turned left into the alley to go home and drove at two to three miles an hour through a large mudhole shown in photographs introduced in evidence. Perricllia testified that Wilson was with Mercer in the alley but did not say anything. Although he was certain there was a third person with the other two, Perricllia did not know who he was or where he went.

Perricllia repeated in detail what was included in the second statement, asserting that Mercer ordered him to get out of his car but that he refused to do so. Mercer cursed him and reached through the car window to get him. Perricllia said he "scooted over" in his seat and told Mercer he did not want any trouble with him, but Mercer would not let him get under the wheel. Mercer tried to get in the car through the window and "grabbed" at the door, "trying to jerk it open." Mercer reached through the window and hit him, then reached through again and pulled his shirt

open. When Mercer reached through the window again, Perricllia said he thought his life was in danger. His only thought was to get Mercer off him, so he shot. When he fired at Mercer, he was leaning on the console between the bucket seats of his car; Mercer was leaning into the car. Because Perricllia was "still in shock," he did not know whether he had hit Mercer or where Mercer had gone. He could not remember how many shots he fired because he was scared. After sitting for a "split second or something," he drove slowly home.

Perricllia explained that he did not get out of his car, as Mercer demanded, because he knew that if he did, Mercer, Wilson, and the unidentified third person would probably have killed him. He could not drive away, he said, because Mercer was reaching through the window "getting hold" of him. Perricllia testified that Mercer's exact words were, "Get out of the car, you son of a bitch. I'm going to kill you and beat your brains out."

Perricllia acknowledged that he had carried a weapon for five years for protection because he usually drove by himself. He said, "That's a bad place right there at that beer joint. People . . . all the time coming in and out, a bunch of drunks . . . ." Perricllia specifically denied having told Mercer that he would get out and "kick [his] ass" or anything of that nature.

█ Viewing the evidence and all reasonable inferences therefrom in the light most favorable to the Commonwealth, as we must, we cannot say that the evidence is insufficient as a matter of law to support Perricllia's conviction. Killing with malice but without premeditation and deliberation is murder of the second degree. *Painter* v. *Commonwealth,* 210 Va. 360, 364, 171 S.E.2d 166, 169 (1969). The jury was instructed as to what must be proved to convict Perricllia of murder of the first degree, murder of the second degree, and voluntary manslaughter. The jury also was instructed that malice might be inferred from the deliberate use of a deadly weapon, unless the jury had a reasonable doubt whether malice existed.* *See Compton* v. *Commonwealth,* 219 Va. 716, 730, 250 S.E.2d 749, 758 (1979).

█ The uncontradicted evidence shows that Mercer was killed by a deadly weapon fired by Perricllia. If the jury believed Wilson's testimony, Perricllia started an argument with Mercer by

---

* In oral argument, counsel for Perricllia conceded that his objection to this instruction on implied malice was untenable.

mumbling something which Wilson could not understand but which angered Mercer. Wilson denied that he or Mercer had yelled at Perricllia. The argument continued with threats exchanged between Perricllia and Mercer and with Perricllia grasping the door handle on the car but not opening the door. According to Wilson, Mercer did not lean through the car window but stood straight up before Wilson turned away. When Wilson turned back, Mercer had his hands on his chest.

It is true that Lethia Vance testified that Wilson was on the opposite side of the alley from where he said he was standing and that Mrs. Mercer did not see him at all, but these inconsistencies were properly to be weighed and resolved by the jury. Perricllia argues that Mrs. Mercer's testimony was incredible, but the evidence did not show that it was impossible for her to have seen the shooting.

Perricllia says that the evidence that one bullet went down at a 45-degree angle after striking Mercer's chest conclusively established that Mercer was leaning into the car when he was shot. We disagree. The order in which the three shots were fired was not shown. The angle described by the descending bullet could have been caused by Mercer's leaning through the window, but that is not the only logical explanation. Mercer could have been entirely outside the car when he was shot, as the testimony of Wilson and Mrs. Mercer indicated. As he stood beside the car, the first shot could have entered his right arm, passing through the arm horizontally. Either doubled over in pain or ducking to avoid further injury, Mercer next could have received the bullet which entered his chest and descended at a 45-degree angle. Then while the force of this blow propelled him, completing his turn away from Perricllia, the final shot could have entered the left side of his back and travelled upward through his heart. Since there was evidence that Mercer turned from the car, it is reasonable to infer that the shot entering his back came after he turned. But no conclusive inference may be drawn that he was leaning through the window when either of the other shots was fired. There was evidence from which the jury could find that Perricllia was guilty of first-degree murder, second-degree murder, or voluntary manslaughter. It follows, therefore, that the evidence was sufficient to support the conviction of second-degree murder.

Perricllia argues that the trial court erred in instructing the

jury on self-defense, his theory of the case. The court granted Instruction 11, tendered by Perricllia, which reads as follows:

> If you believe that the defendant was without fault in provoking or bringing on the difficulty, and if you further believe that the defendant reasonably feared, under the circumstances as they appeared to him, that he was in danger of being killed or that he was in danger of great bodily harm, then the killing was in self-defense and you shall find the defendant not guilty.

The Commonwealth argued in the trial court that Instruction 11 correctly covered justifiable homicide, if the jury believed the defendant was without fault, but failed to cover excusable homicide, if the jury believed the defendant was partly at fault. The trial court, over Perricllia's objection, granted Instruction 14, tendered by the Commonwealth, which reads as follows:

> If you believe beyond a reasonable doubt that the defendant was with some fault in provoking or bringing on the difficulty, and if you further believe that when attacked:
> 1. he retreated as far as he safely could under the circumstances,
> 2. in a [sic] good faith attempted to abandon the difficulty, and
> 3. made known his desire for peace by word or act; and
> 4. he reasonably feared, under the circumstances as they appeared to him, that he was in danger of being killed or that he was in danger of great bodily harm, then the killing was in self-defense and you shall find the defendant not guilty.

■ Perricllia says that the court erred in granting Instruction 14 because it was a mutual combat instruction and there was no evidence of mutual combat in the case. The trial court, however, while agreeing that there was no evidence of mutual combat, approved the instruction after it was drafted in language paralleling that of Instruction 11, using the word "difficulty." As given, it was a finding instruction setting forth the elements of excusable homicide. *See Yarborough* v. *Commonwealth,* 217 Va. 971, 975, 234 S.E.2d 286, 290 (1977); *Bailey* v. *Commonwealth,* 200 Va. 92,

96, 104 S.E.2d 28, 31 (1958). We do not believe that excusable homicide is limited to mutual combat. It is a broader concept embracing less aggressive conduct. If a defendant is even slightly at fault, the killing is not justifiable homicide. *Dodson* v. *Commonwealth,* 159 Va. 976, 981, 167 S.E. 260, 261 (1933).

The Commonwealth's theory supporting Instruction 14 was that Perricllia provoked the fatal argument with Mercer, and, instead of driving off, remained in a place of relative safety and shot Mercer three times. The Commonwealth's evidence indicated that Mercer never struck Perricllia or leaned into the car. Since the evidence was conflicting, it was a jury issue whether Perricllia was entirely free from fault in provoking the altercation. Therefore, it was proper to give the jury two finding instructions on self-defense, one based on Perricllia's being entirely free from fault and one based on his being partly at fault in bringing on the difficulty.

Holding that the evidence was sufficient to support the jury verdict and that the jury was properly instructed, we will affirm the judgment of the trial court.

*Affirmed.*