COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Felton, Judges Benton and Petty
Argued at Richmond, Virginia


ROBERT LESLIE SLAYTON
                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 0441-06-2                    JUDGE WILLIAM G. PETTY
                                                           MAY 1, 2007
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Margaret P. Spencer, Judge

Steven D. Benjamin (Betty Layne DesPortes; Benjamin &
DesPortes, on briefs), for appellant.

Alice T. Armstrong, Assistant Attorney General II (Robert F.
McDonnell, Attorney General, on brief), for appellee.


        Appellant, Robert Leslie Slayton, challenges his convictions for one count of statutory

burglary, in violation of Code § 18.2-91; one count of aggravated malicious wounding, in violation

of Code § 18.2-51.2; two counts of malicious wounding, in violation of Code § 18.2-51; and one

count of assault and battery, in violation of Code § 18.2-26.[1]  Slayton was convicted following a

bench trial.  On appeal, Slayton argues that the trial court erred when it failed to conduct an inquiry

concerning a conflict of interest of his trial counsel.[2]  Slayton also challenges the sufficiency of the

evidence to support his convictions.  Additionally, Slayton argues that the trial court erred in

rendering inconsistent verdicts when it acquitted him of attempted malicious bodily injury as to one

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Slayton was indicted for one count of attempted malicious wounding, but the trial court
convicted him of the lesser-included offense of assault and battery.

[2] At trial Wayne Morgan, Esq., represented Slayton.

victim, yet convicted him of aggravated malicious wounding and malicious bodily injury as to the other three victims. We disagree with Slayton and affirm his convictions.

## I. BACKGROUND

On appeal, we view the evidence in the light most favorable to the Commonwealth, the party prevailing below, and grant to it all reasonable inferences fairly deducible from the evidence. Ragland v. Commonwealth, 16 Va. App. 913, 915, 434 S.E.2d 675, 676-77 (1993). So viewed, the evidence establishes that on Friday, August 25, 2000, Slayton dropped his girlfriend, Bridgett Taylor, off at her co-workers Heather Williams' and Shannon Overton's apartment. The three women went to a bar. While at the bar, they met some of Williams' high school friends: Jermaine Norman, Tony Peters, Sheridan Harding, and Corey Jordan. The women left the bar and returned to the apartment around 2:00 a.m. Saturday, August 26.

Shortly after they arrived at the apartment, Williams received a call from Jordan asking if he, Norman, Peters, and Harding could come over to visit. Williams gave them permission to come over, and informed Overton and Taylor that the men were coming to the apartment. By that time, Slayton and his younger brother Timmy had arrived to take Taylor home. The three of them were in Slayton's truck when Norman, Peters, Harding, and Jordan arrived. After their arrival, Slayton and Peters, and eventually Peters' friends, engaged in a "scuffle" in the apartment's parking lot. Slayton, his brother, and Taylor all left after the fight. Williams and Overton went to apologize to their neighbors for the disturbance, while Norman, Peters, Harding, and Jordan stayed out on the apartment's front porch.

Taylor testified that she realized that she had left her purse behind shortly after they had left the apartment. She stated that she asked Slayton to go back to the apartment and retrieve it. Slayton drove to a nearby gas station and called his father to come pick up Taylor and Timmy. Slayton then used his wireless phone to call two other men, Tim Anderson and Tony Venable, to return to the

apartment with him.[3] Neither Slayton nor Taylor attempted to call the apartment and inquire about the purse. Further, Shannon Overton testified that as Taylor was leaving the apartment, she reminded Taylor that her purse was in the car they had used to drive to the bar.

When Slayton and his companions arrived back at the apartment, Norman, Peters, Harding, and Jordan saw them coming towards the porch and ran inside the apartment. Slayton and the other two men rushed in after them. Jordan felt something hit him in the back as he ran through the apartment and out the back door. Peters and Harding testified that Slayton and the other two men beat them with baseball bats and kicked them while they were lying on the floor trying to protect themselves. Peters testified that as they were running he heard "a smack" and turned around to see Norman on the floor in the hallway. Harding testified that he saw Slayton and Peters fighting and that someone grabbed his shirt and pulled it over his head. Harding could not see at that point, but said he was then beaten with baseball bats – one wooden and one metal.

Peters testified that Slayton hit him with a wooden baseball bat and that he was kicked after he fell to the floor. Slayton's counsel attempted to impeach Peters' statement that he saw Slayton with a baseball bat in his hand, by asking Peters whether he recalled testifying at the preliminary hearing that Slayton did not have a bat. When Peters responded that he did not remember his preliminary hearing testimony, Slayton's counsel ended that line of questioning.

Jermaine Norman had no memory of the incident at the apartment. He remembered being on the porch and everyone running. His next memory is waking up in the ambulance. While no one saw how Norman was injured, at the end of the mêlée he was found lying in the hallway, unconscious and bleeding.

Dr. John Wright treated Norman's injury at the hospital and testified as an expert witness at trial. Dr. Wright explained that Norman's left eye had ruptured and that most of the eye's contents

---

[3] The police were not able to locate these individuals by the time of the trial.

had been lost. The optic nerve was severed by something sharp, and Norman suffered a severe nasal fracture as well. Because of his injuries, Norman's left eye had to be removed and he now wears a prosthetic eye. Dr. Wright testified that Norman's injuries were consistent with blunt force trauma to his head such as being struck with a baseball bat. Slayton testified that no one hit Norman, but that he saw Norman injure himself by running into a doorjamb.

The trial court convicted Slayton, specifically stating that it did not credit Slayton's and Taylor's testimony. This appeal followed.

## II. ANALYSIS

### A. Conflict of Interest

Slayton argues that his convictions should be reversed because the trial court failed to inquire into a conflict of interest between him and his trial counsel. For the reasons stated below, we have determined that this claim is one for ineffective assistance of counsel, which we cannot hear on direct appeal.

During the trial, victim Tony Peters testified that Slayton had struck him with a wooden baseball bat. On cross-examination, Slayton's trial counsel attempted to impeach Peters' testimony with a prior inconsistent statement by asking Peters whether he remembered testifying at the preliminary hearing that Slayton did not have a bat. When Peters responded that he did not remember making that prior statement, Slayton's counsel made no further attempt to impeach the witness. Following his conviction, but before sentencing, Slayton wrote a letter to the trial judge claiming that he "was misrepresented." Slayton also asked her to "check the testimony at the preliminary [sic]." Slayton claimed, "[n]one of the witnesses testified that I, in any way, made any kind of assault or helped anyone to do so."

Now, on appeal, Slayton argues that his trial counsel's failure to impeach Peters' testimony, in combination with this letter, should have alerted the trial court to an actual conflict of interest:

namely, that Slayton's counsel served his own pecuniary interest when he failed to withdraw from the representation, thereby losing his fee, in order to serve as an impeachment witness on Slayton's behalf.[4]  Relying on Mickens v. Taylor, 535 U.S. 162 (2002), Slayton argues that this conflict was or should have been so apparent to the trial court that its failure to inquire into it was reversible error.

In Mickens, a federal habeas case alleging ineffective assistance of counsel, the Supreme Court declined to extend the "automatic reversal rule" it enunciated in Holloway v. Arkansas, 435 U.S. 475 (1978).  Mickens, 535 U.S. at 168.  The Holloway Court held that a trial court must investigate any potential conflicts when defense counsel advises the court of a conflict of interest in a situation involving the multiple representation of criminal codefendants.  Holloway, 435 U.S. at 478-81, 484.  The remedy for this failure is an automatic reversal of the conviction, without further inquiry.  Id. at 488; see also Mickens, 535 U.S. at 168 ("Holloway presumed . . . that the conflict 'which [the defendant] and his counsel tried to avoid by timely objections to the joint representation undermined the adversarial process" – a presumption that is "justified because joint representation is inherently suspect . . . ." (quoting Holloway, 435 U.S. at 490)).

The Mickens decision emphasized that the Holloway rule applied "only where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict."  Mickens, 535 U.S. at 168 (citing Holloway, 434 U.S. at 488).  Mickens also makes clear that Holloway does not apply when "the trial court is aware of a vague, unspecified possibility of conflict . . . . "  Id. at 169.  In this situation, the record would have to show "that [trial] counsel *actively represented* conflicting interests."  Id. at 175 (quoting Cuyler v. Sullivan, 446 U.S. 335, 350 (1980)) (emphasis in original) (internal quotation marks omitted).

---

[4] The record is unclear as to whether the tape recording of the preliminary hearing was inaudible; however, there was no transcript of the preliminary hearing available.

Despite the manner in which Slayton has couched this issue on appeal, we have determined that it is, in substance, a claim for ineffective assistance of counsel, requiring the resolution of issues not properly before us. "Claims raising ineffective assistance of counsel must be asserted in a habeas corpus proceeding and are not cognizable on direct appeal." Lenz v. Commonwealth, 261 Va. 451, 460, 544 S.E.2d 299, 304 (2001)).[5] We do not hear these issues on direct appeal, because, as our Supreme Court has recognized, this kind of inquiry is best made in a separate habeas corpus proceeding. Walker v. Mitchell, 224 Va. 568, 299 S.E.2d 698 (1983). Such a proceeding "affords both sides an opportunity to develop fully the factual and legal bases of their positions with respect to a claim of ineffective assistance of counsel." Id. at 571, 299 S.E.2d at 669. On the record before us, there is no way of knowing whether there was an actual conflict of interest, and whether that conflict affected Slayton's representation at trial. This record, like "the ordinary criminal trial record[,] is insufficient to show the reasons counsel employed or did not employ a particular trial tactic." Id.

### B. Sufficiency of the Evidence

Slayton also argues that the trial court relied upon insufficient evidence to convict him of both burglary and bodily injury and aggravated malicious wounding. For the reasons stated below, we disagree and hold that the evidence was sufficient.

### 1. Standard of Review

Slayton challenges the trial court's findings of intent and malice. Whether malice and intent existed are questions of fact. Branch v. Commonwealth, 14 Va. App. 836, 841, 419 S.E.2d 422, 426 (1992); Commonwealth v. Vaughn, 263 Va. 31, 36, 557 S.E.2d 220, 223 (2002). On appeal, we can reverse these factual findings only if the trial court's decision is "plainly wrong or

_____

[5] Code § 19.2-317.1, which allowed direct appeal of ineffective assistance of counsel claims under certain circumstances, was repealed in 1990. See 1990 Va. Acts, c. 74.

without evidence" to support it. Code § 8.01-680. Under this standard, we examine the record to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

We are also mindful that circumstantial "evidence 'is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" Hollins v. Commonwealth, 19 Va. App. 223, 229, 450 S.E.2d 397, 400 (1994) (quoting Coleman v. Commonwealth, 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983)). "The Commonwealth need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant." Hamilton v. Commonwealth, 16 Va. App. 751, 755, 433 S.E.2d 27, 29 (1993). Whether a hypothesis of innocence is reasonable is a question of fact. See Cantrell v. Commonwealth, 7 Va. App. 269, 290, 373 S.E.2d 328, 339 (1988).

## 2. Burglary Conviction

Slayton challenges the sufficiency of the evidence supporting the trial court's finding that he had the intent to commit assault and battery when he entered the apartment. We hold that the trial court based its decision on sufficient evidence of intent.

In order to convict an accused of statutory burglary, the Commonwealth must, as pertinent to this case, prove that the accused entered the dwelling house of another, during the nighttime, "with intent to commit assault and battery." Code §§ 18.2-90 and 18.2-91. Because statutory burglary is an "offense comprised of an act combined with a particular intent, 'proof of such intent is as necessary as proof of the act itself and must be established as a matter of fact.'" Hucks v. Commonwealth, 33 Va. App. 168, 175, 531 S.E.2d 658, 661 (2000) (quoting Ridley v. Commonwealth, 219 Va. 834, 836, 252 S.E.2d 313, 314 (1979)).

Our Supreme Court has defined intent as "the purpose formed in a person's mind which may, and often must, be inferred from the facts and circumstances in a particular case. The state of mind of the offender may be shown by his acts and conduct." Ridley, 219 Va. at 836, 252 S.E.2d at 314 (citing Patterson v. Commonwealth, 215 Va. 698, 699, 213 S.E.2d 752, 753 (1975)). Thus, the Commonwealth may prove the requisite intent by circumstantial evidence. Hucks, 33 Va. App. at 175, 531 S.E.2d at 661.

Here, the evidence establishes that Slayton, after recruiting two friends, returned to the apartment where he had just been involved in a brawl. Witnesses testified that Slayton and his friends came armed with baseball bats, and when the four young men on the porch ran inside the apartment, Slayton and his companions chased after them, beat them with bats, and kicked them. Further, while Slayton and Taylor, his girlfriend, both testified that Slayton returned to the apartment to retrieve Taylor's purse, neither of them called the apartment to ask permission to return or to inquire whether the purse was there despite having a wireless phone. Finally, Overton, one of the women who lived at the apartment, testified that she specifically told Taylor, before she left with Slayton, that she had left her purse in the car that they had used that evening to go out.

Based on the above evidence, we conclude that the trial court did not err in finding the requisite intent for the burglary conviction. The trial court, as the finder of fact, was not required to "believe the accused's explanation," that he returned to retrieve his girlfriend's purse; it could instead infer that he was not truthful. See Black v. Commonwealth, 222 Va. 838, 842, 284 S.E.2d 608, 610 (1981). We hold that there was sufficient evidence from which the trial court could determine that Slayton returned to the apartment with intent to assault the four men with whom he had recently fought. The trial court was entitled to find Slayton's purportedly innocent explanation incredible.

- 8 -

3. Malicious Wounding and Aggravated Malicious Wounding Convictions

Slayton also argues that the trial court erred in finding the requisite intent to support the malicious wounding and aggravated malicious wounding convictions. The Commonwealth's burden for proof of intent is the same for both malicious wounding and aggravated malicious wounding. Code §§ 18.2-51 and 18.2-51.2 require a showing of malice and the intent to "maim, disfigure, disable, or kill." For the reasons stated below, we conclude that the Commonwealth adduced sufficient evidence of malice and intent at trial.

Malice

Malice is "the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will. It may be directly evidenced by words, or inferred from acts and conduct which necessarily result in injury.'" Robertson v. Commonwealth, 31 Va. App. 814, 823, 525 S.E.2d 640, 645 (2000) (quoting Hernandez v. Commonwealth, 15 Va. App. 626, 631, 426 S.E.2d 137, 140 (1993)). Malice is not "confined to ill will, but includes any action flowing from a wicked or corrupt motive, done with an evil mind or wrongful intention, where the act has been attended with such circumstances as to carry in it the plain indication of a heart deliberately bent on mischief." Williams v. Commonwealth, 13 Va. App. 393, 398, 412 S.E.2d 202, 205 (1991). Our Supreme Court has also held that malice may be inferred "from the deliberate use of a deadly weapon." Perricllia v. Commonwealth, 229 Va. 85, 91, 326 S.E.2d 679, 683 (1985).

When viewed in the light most favorable to the Commonwealth, the evidence presented at trial proved that Slayton acted with malice. After earlier engaging in a fight with the victims, Slayton recruited two acquaintances to return to the apartment with him. The three men were armed with two baseball bats. When the four victims ran into the house, Slayton and his companions chased them inside, beat them with baseball bats, and kicked them. This attack led to a number of injuries, including cuts, bruises, contusions, and, in the case of Norman, the loss of his left eye.

Moreover, the trial court could have reasonably inferred malice from the fact that one witness identified Slayton as wielding a baseball bat during the attack. Our Supreme Court defines a deadly weapon as "one which is likely to produce death or great bodily injury from the manner in which it is used, . . . [.] [W]hether a weapon is to be regarded as deadly often depends more on the manner in which it has been used than on its intrinsic character." Pannill v. Commonwealth, 185 Va. 244, 254, 38 S.E.2d 457, 462 (1946); see also Pritchett v. Commonwealth, 219 Va. 927, 929, 252 S.E.2d 352, 353 (1979) (holding that a club is a deadly weapon). Slayton beat the victims with a baseball bat about the head and back; he hit Norman with enough force to rupture his left eye and sever the optic nerve. The trial court had ample reason to find malice on these facts.

We conclude that the trial court could reasonably infer malice from the facts that Slayton returned armed, with reinforcements, and engaged in a deliberate, unprovoked attack. Therefore, we will not disturb its finding of malice on appeal.

### Intent to Maim, Disfigure, Disable, or Kill

The Commonwealth was also required to prove that Slayton acted with the intent to "maim, disfigure, disable, or kill."

In determining whether Slayton had the intent to maim, disfigure, disable, or kill his victims, "[t]he fact finder [was] entitled to draw inferences from those facts proven to be true, so long as the inferences are reasonable and justified." Cottee v. Commonwealth, 31 Va. App. 546, 555, 525 S.E.2d 25, 30 (2000) (citation omitted). The trial court was also able to examine "[t]he nature and extent of the bodily injur[ies] and the means by which [they were] accomplished" in finding intent. Campbell v. Commonwealth, 12 Va. App. 476, 484, 405 S.E.2d 1, 4 (1991). Finally, the trial court was entitled to infer that Slayton "'intend[ed] the immediate, direct, and necessary consequences of his voluntary acts.'" Id. (quoting Kelly v. Commonwealth, 8 Va. App. 359, 373, 382 S.E.2d 270, 278 (1989)).

Here, as discussed above, the trial court heard evidence proving that Slayton returned to the apartment with two companions, armed with baseball bats, and chased the four young men into the apartment. Slayton and his companions then beat and kicked the victims. The trial court also saw photographs of the victims' injuries. These photographs reveal that Tony Peters suffered bruising on his back, including a bruise near the kidney area on the right side, and that Sheridan Harding received a cut behind his ear, a cut on the inside of his lip, and bruising. They also show the severe injury to the left side of Jermaine Norman's face and left eye, resulting in his permanent disfigurement and disability.

It is apparent from these photographs that Slayton inflicted injuries on areas of the victims' bodies that were likely to result in serious injury, disfigurement, disability, or death: the face, head, and back. See Campbell, 12 Va. App. at 485, 405 S.E.2d at 5 (affirming conviction when "the natural consequence" of forceful blows "near [victim's] spinal column and right kidney[] was disfigurement or disablement of the [victim]"); see also Roark v. Commonwealth, 182 Va. 244, 250, 28 S.E.2d 693, 695 (1944) (The intent to maim, disfigure, disable, or kill a person can be inferred from repeated blows applied to "vital and delicate parts of the body of a defenseless, unresisting person on the ground.").

Thus, we conclude that the evidence presented below supports Slayton's convictions for malicious wounding and aggravated malicious wounding.

### C. Inconsistent Verdicts

Slayton argues that the trial court committed reversible error by convicting him of two counts of malicious wounding and one count of aggravated malicious wounding, but acquitting him of one count of attempted malicious wounding. Slayton notes that he did not preserve this issue for appeal in the trial court, and asks us to apply the "ends of justice" exception to Rule 5A:18. We decline to do so.

Application of the ends of justice exception requires proof of an error that was "clear, substantial and material." Brown v. Commonwealth, 8 Va. App. 126, 132, 380 S.E.2d 8, 11 (1989). The record "must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage might have occurred." Redman v. Commonwealth, 25 Va. App. 215, 221, 487 S.E.2d 269, 272 (1997) (citing Mounce v. Commonwealth, 4 Va. App. 433, 436, 357 S.E.2d 742, 744 (1987)). Application of the ends of justice exception is appropriate where "[the accused] was convicted for conduct that was not a criminal offense" or "the record . . . affirmatively proves that an element of the offense did not occur." Id. at 221-22, 487 S.E.2d at 272-73.

The record in this case does not meet this well-settled standard. Slayton was not convicted for non-criminal behavior. Moreover, the record does not affirmatively prove that an element of the offense did not occur. On the contrary, the record is replete with evidence of malice and the intent to disfigure, maim, disable, or kill as to three of the victims, as discussed *supra*. See Nobles v. Commonwealth, 218 Va. 548, 238 S.E.2d 808 (1977) (holding conviction for trespass, rather than statutory burglary, was not inconsistent with conviction for attempted murder because defendant's intent could change after entering the house). We therefore decline to apply the "ends of justice" exception in this case.

III. CONCLUSION

Based on the foregoing discussion, we affirm the convictions.

Affirmed.