COURT OF APPEALS OF VIRGINIA

Present:   Judges Friedman, Chaney and Lorish
Argued at Salem, Virginia

TRACEY DARNELL TAYLOR

v.        Record No. 0811-23-3

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE FRANK K. FRIEDMAN
JULY 23, 2024

FROM THE CIRCUIT COURT OF THE CITY OF BUENA VISTA
Christopher B. Russell, Judge

Daniel E. Mowry (Nelson, McPherson, Summers & Santos, L.C., on
brief), for appellant.

Stephen J. Sovinsky, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Tracey Darnell Taylor raises two challenges to the sufficiency of the evidence on

convictions arising out of a shooting incident within her home.  Taylor was convicted in a jury trial

of child endangerment, maliciously discharging a firearm within an occupied building, brandishing

a firearm, and discharging a firearm in violation of a local ordinance.  Taylor challenges the

sufficiency of the evidence on the child endangerment count on the ground that the Commonwealth

failed to prove that her daughter was a child at the time of the shooting.  She also challenges the

sufficiency of the evidence on her conviction for maliciously discharging a weapon in an occupied

building, arguing that the evidence did not prove that she acted maliciously.  After examining the

briefs and record in this case, the panel affirms because Taylor's claims are procedurally barred and

otherwise lack merit.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND[1]

Paul Thompson's Version of Events

Thompson had known Taylor for about four years prior to December 3, 2022. The two had had a volatile, on-again-off-again relationship in which they frequently argued but also were affectionate to each other. Thompson had done some work for Taylor at her house. On December 3 and 4, the two argued. On December 3 Taylor nevertheless picked up Thompson at his home and the two went to a grocery store together. After returning to Thompson's home for him to drop off his groceries and then driving home with her own groceries, Taylor returned to Thompson's home about 10:30 p.m. and picked him up again. The two went to Taylor's home but again began to argue. Thompson left and walked to the home of a friend named Paul Umbarger.

While visiting Umbarger, Thompson realized that he had left his phone at Taylor's house and went back to retrieve it sometime between 11:00 p.m. and midnight. The back door to the kitchen was open, and Thompson said hello as he entered. Thompson walked through the hallway toward the living room and saw his phone lying on a coffee table. Taylor was lying on a sofa, her daughter was asleep on another sofa, and Torrie Austin, an acquaintance of Taylor's, was in a recliner. Thompson took his phone and began to walk out, at which point Taylor pulled out a gun and said she was going to shoot him. Thompson was about to turn into the kitchen from the hallway when he heard a shot. At trial, Thompson estimated that Taylor was about ten feet away when she fired the gun.

---

[1] On appeal, we review the evidence "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

After Taylor fired her gun, Austin fled from the home and Thompson returned to Umbarger's home. Later, Thompson returned to Taylor's property (without entering her home) to help Austin, who was trying to retrieve clothes she had left at Taylor's house.

Austin's Version of Events

Austin had known Thompson for a long time but had known Taylor "personally" only recently. Austin stayed with Taylor at her home for a couple of days before December 3, during which time Thompson was there "a lot." Taylor sometimes told Thompson to go away but on other occasions they engaged more amicably.

Austin testified that on December 3, she and Nickie McGowan went to the grocery store with Taylor and Thompson in Taylor's truck. Austin had an outstanding arrest warrant and planned to turn herself in but wanted to see her son before she was arrested. Thompson drove Austin back to McGowan's home in Taylor's truck. Several hours later, Taylor picked up Austin and McGowan and drove back to her home; Taylor "was frantic, asking why [Austin and McGowan had] left her alone with [Thompson]." McGowan left after that, but Taylor's daughter M.F. returned home from work and joined Taylor and Austin in the living room.

Thompson then came to the house and said he wanted his phone, which Taylor had taken earlier that night. He and Taylor argued, and she told him to leave. Shortly after that, however, Thompson came through the hallway from the kitchen and demanded his phone. Thompson grabbed his phone and as he walked through the hallway, Taylor told him "to get out of my house or I'm going to shoot you and he said well shoot me then. Shoot me. He kept on saying it . . . as he was walking down the hallway." At that point, Taylor went to a gun safe, retrieved a gun, and fired a shot. The gun was pointed down the hallway.

Austin testified that the shooting occurred about 2:00 a.m. on December 4. Several hours earlier Taylor had sent Austin a phone text complaining that she had been left alone with Thompson

and that "he's acting crazy and I'm going to shoot him." A phone text Taylor sent to Austin at 8:34 p.m. that was introduced at trial stated: "I'm going to shoot him. I'm not playing."

After Taylor fired her gun, she let Austin take her truck and go with M.F. to McGowan's home. When M.F. became "hysterical" and said she wanted to go back to her mother's home, Austin drove her back to Taylor's house. On their return, Austin saw Thompson outside. Austin then began to walk to her uncle's home but Thompson "caught up with" her and the two walked to Umbarger's home. Austin testified that she did not fear Thompson at that time.

Taylor Reports the Incident and the Police Investigate

On December 4, Taylor went to the Buena Vista Police Department and told Detective Cameron Wheeler that she "had shot a warning shot at Paul Thompson for taking multiple items inside of her house." Wheeler had previously investigated "multiple" matters involving Taylor and Thompson. Wheeler spoke later that day with Thompson to get his account of the incident.

On December 8, Wheeler executed a search warrant at Taylor's home. Based on his observations as well as information from Taylor, Wheeler took several pictures and drew a sketch that depicted the shot as having been fired from the living room next to the "Juvenile's bedroom" down the hallway. Taylor indicated to Wheeler that she had fired a warning shot "at or in the direction of" Thompson. Taylor acknowledged to Wheeler that she had fired her gun while standing in the living room. Wheeler identified the first bullet impact as a .22 caliber round that struck just above a bedpost in a bedroom adjoining the kitchen. The bullet went through the bedroom wall and then struck the laundry room before coming to rest in a window. The search of Taylor's home did not indicate that "anything was taken." There was no other damage to the home.

The Trial

After the Commonwealth rested, the trial court denied the defense's motion to strike the evidence on an attempted second-degree murder count.

*M.F.'s Testimony*

Testifying for Taylor, her daughter M.F. stated that she had been asleep on the couch in the living room on the night of December 3 when she was awakened by Thompson. Thompson was loud and "behaving very aggressively" and began to argue with Taylor. M.F. stated that Thompson took her mother's phone and wallet and then walked down the hallway. Then, as she heard "rattling" in the silverware drawer in the kitchen, M.F. heard a gun fired. M.F. was concerned for Taylor's safety. M.F. then heard the door to the house shut.

*Taylor's Testimony*

Testifying in her own behalf, Taylor acknowledged that she and Thompson had had a tempestuous relationship and had argued on December 3 and 4. Taylor had returned to her home about 11:30 p.m. on December 3 and locked her door. Taylor was talking with Austin and M.F. was dozing in the living room when at 2:38 a.m. Thompson came "charging down the hallway." Taylor told Thompson to leave but several minutes later he returned and seized her phone and wallet. Taylor admitted that she went to her gun safe and retrieved her gun. Thompson then threw down Taylor's wallet, which he had emptied, "chest bumped" her, and told her to shoot him.

Taylor claimed that she then heard Thompson going through her kitchen drawer, which contained "this long sword, big sword, my knives, everything." Taylor testified that she fired her gun with her left hand down the hallway but was "not aiming, Paul was not in the hallway." Thompson finally left but came back the following day. Taylor maintained that she had not intended to hurt Thompson but had acted to protect "my home, my kid, my guest, my property."

*Defense Arguments*

Taylor raises two sufficiency arguments on brief. First, she asserts the Commonwealth did not prove that M.F. was a juvenile at the time of the shooting and thus her child endangerment conviction failed under Code § 40.1-103(A). *See also* Code § 1-207 ("child" is defined as a person

less than 18 years of age).  Second, Taylor contends the Commonwealth failed to prove that she acted maliciously when she fired her gun within her occupied home.  Code § 18.2-279.  At trial, Taylor moved to strike the charge of attempted second-degree murder.  She did not challenge the sufficiency of her other charges in the trial court.

## ANALYSIS

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice."  Rule 5A:18.  Upon review, the Court holds that each of Taylor's claims is procedurally barred under Rule 5A:18.  After the Commonwealth rested its case-in-chief, Taylor moved to strike but only on the charge of attempted second-degree murder.[2]  Then, after both parties had rested, the defense merely renewed its initial motion to strike.  When the jury returned its verdicts, Taylor did not move to set aside the verdicts, even after the court asked if there were any motions.  Thus, the record establishes that Taylor did not preserve her challenges to the sufficiency of the evidence for the child endangerment and maliciously shooting within an occupied building counts.

Taylor seeks to overcome her procedural defaults by invoking the ends of justice exception to Rule 5A:18.  Taylor rightly characterizes this exception as "narrow and is to be used sparingly." *Holt v. Commonwealth*, 66 Va. App. 199, 209 (2016) (en banc) (quoting *Redman v. Commonwealth*, 25 Va. App. 215, 220 (1997)).

### I.  The Ends of Justice Exception Does Not Support Overturning the Child Endangerment Conviction.

It is axiomatic that on appeal the evidence is viewed in the light most favorable to the prevailing party at trial, here the Commonwealth.  *Commonwealth v. Hudson*, 265 Va. 505, 514

---

[2] The jury acquitted Taylor on this count.

(2003). "Viewing the record through this evidentiary prism requires us to discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Fary v. Commonwealth*, 77 Va. App. 331, 341 (2023) (en banc) (internal quotation marks and citations omitted), *aff'd*, 303 Va. 1 (2024) (order).

In the Commonwealth's case-in-chief, it introduced the sketch Detective Wheeler made depicting the layout of Taylor's home and the path of the bullet that she admittedly fired toward the hallway. The sketch referred to the bedroom next to the living room where Taylor shot her gun as the "Juvenile's bedroom." Similarly, in his testimony Detective Wheeler referred to a photograph he had taken of a door next to what the sketch described as the "juvenile's bedroom."

Beyond this, as Taylor acknowledges, on cross-examination M.F. testified that she was 17 years old at the time of the shooting.[3] "[T]o show that a miscarriage of justice has occurred, . . . the appellant must demonstrate that he or she was convicted for conduct that was not a criminal offense or the record must affirmatively prove that an element of the offense did not occur." *Brittle v. Commonwealth*, 54 Va. App. 505, 514 (2009). Here, the record contains evidence from which a rational jury could conclude that M.F. was a "child" when Taylor fired the gun inside the home.

The ends of justice exception obliges an appellant "to present not only a winning argument on appeal but also one demonstrating that the trial court's error results in a 'grave injustice' or a wholly inexcusable 'denial of essential rights.'" *Winslow v. Commonwealth*, 62 Va. App. 539, 546-47 (2013) (quoting *Brittle*, 54 Va. App. at 513). Taylor cannot demonstrate a winning argument or a grave injustice as to her child endangerment conviction.

---

[3] In a similar vein, in argument at sentencing defense counsel stated that M.F. was "almost eighteen" and that Taylor's confinement after the shooting meant that she had missed out on such things as "a daughter who had senior prom, who had their last Christmas at home prior to college . . . ." And much like her trial testimony M.F. stated that she was 17 years old and would turn 18 the following August.

II. The Ends of Justice Exception Does Not Support Overturning the Maliciously Shooting Within an Occupied Building Conviction.

Taylor's remaining sufficiency argument is equally unavailing and demonstrates that the ends of justice exception likewise does not properly apply to excuse her default.  Thompson and Taylor gave substantially different accounts of the events leading up to her retrieving her gun and firing it at Thompson down the hallway.  It is fundamental that on appeal all such conflicts are resolved in the Commonwealth's favor, in assessing the sufficiency of the evidence.  The totality of the evidence permitted the jury to conclude that Taylor acted maliciously when she fired the gun.

Thompson testified that he entered Taylor's home on the night of December 3-4 after having been with her several times that day.  The back door to the kitchen was open, and Thompson went to retrieve his phone that Taylor had taken earlier in the evening.  As Thompson began to walk back out toward the kitchen door, Taylor fired her gun at him in the hallway from about ten feet.  Thompson denied forcibly grabbing his phone from Taylor, taking her wallet, or going through the drawers in her kitchen.

Detective Wheeler's testimony confirmed Thompson's account that the bullet had traveled through the hallway and struck the wall in a bedroom at about "chest height."  Wheeler observed no other damage to the home.  Wheeler's investigation and search of the home adduced "no leads [or] proof that anything was taken.  The only proof that we had is a shot was fired within the city."

Austin's testimony also corroborated Thompson's account in certain material respects.  She said that he had returned to Taylor's home, stating that he wanted his phone.  Then, after taking (according to Austin) Taylor's phone, Thompson began to walk down the hallway away from Taylor.  Austin stated that "it wasn't much time between" these various actions.  Taylor then went to her gun safe, retrieved her gun, pointed it down the hallway, and fired it.  Thompson at that point was "somewhere down that direction."  Austin testified that "it wasn't much time between" these various actions.  Significantly, although she was unaware of it at the time, Austin received a phone

- 8 -

text from Taylor sometime that night between 8:00 p.m. and 10:00 p.m. in which she complained that Austin and McGowan had left her alone with Thompson and stating that "he's acting crazy. I'm going to shoot him."

In challenging the sufficiency of the evidence on the maliciously shooting within an occupied building conviction and seeking to invoke the ends of justice exception in Rule 5A:18, Taylor relies largely on her own exculpatory, rejected account of the incident. Although Taylor argued at trial that she had acted in self-defense, which could have negated the malice element of the shooting within an occupied building charge, the evidence viewed in the light mandated on appeal proved that she did not offer sufficient evidence of self-defense to raise a reasonable doubt about her guilt. *See Commonwealth v. Sands*, 262 Va. 724, 729 (2001); *Jones v. Commonwealth*, 71 Va. App. 70, 86 (2019). *See also Bell v. Commonwealth*, 66 Va. App. 479, 486 (2016) ("Whether an accused proves circumstances sufficient to create a reasonable doubt that he acted in self-defense is a question of fact.").

As Taylor correctly states, Virginia recognizes two forms of self-defense in criminal cases— justifiable self-defense and excusable self-defense. Justifiable self-defense, or defense without fault, is unavailable if the defendant "is even slightly at fault" in contributing to the incident. *See Perricllia v. Commonwealth*, 229 Va. 85, 94 (1985). The record here makes clear that Taylor was not without fault when she fired her gun at Thompson; certainly, a reasonable trier of fact could so find. Similarly, a reasonable trier of fact could find that Taylor did not act in excusable self-defense. This defense requires that a defendant, even though at some fault in bringing about the difficulty, "retreat[] as far as possible [when attacked], announce[] his desire for peace," and act "from a reasonably apparent necessity to preserve his own life or save himself from great bodily harm." *Bell*, 66 Va. App. at 487 (quoting *Bailey v. Commonwealth*, 200 Va. 92, 96 (1958)). Rather than retreating, Taylor went to her gun safe, retrieved her gun, and fired at Thompson as he was walking

- 9 -

away. From this evidence, the jury reasonably could conclude that Taylor was not acting in self-defense; she was acting maliciously and in keeping with her previously stated intent to shoot Thompson. Under these circumstances, no manifest injustice will result from applying Rule 5A:18.

In sum, the Court holds that both of Taylor's sufficiency claims are procedurally barred under Rule 5A:18. Further, the evidence viewed in the light most favorable to the Commonwealth proved Taylor's actions had endangered her juvenile daughter and that Taylor had acted with malice in shooting at Thompson as he left her home. Accordingly, the Court declines to invoke the ends of justice exception in Rule 5A:18 as a basis for excusing her procedural defaults.

CONCLUSION

Accordingly, the judgment of the trial court is affirmed.

*Affirmed.*