COURT OF APPEALS OF VIRGINIA

Present:  Judges Malveaux, Chaney and White
Argued at Lexington, Virginia

UNPUBLISHED

DOUGLAS DALE GINDLESBERGER

v.       Record No. 0817-24-3

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
KIMBERLEY SLAYTON WHITE
AUGUST 12, 2025

FROM THE CIRCUIT COURT OF PITTSYLVANIA COUNTY
Stacey W. Moreau, Judge

Jason S. Eisner for appellant.

Sheri H. Kelly, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Douglas Gindlesberger was convicted in a bench trial of assaulting and battering a law-enforcement officer, assaulting and battering a family member, and obstructing justice. His three assignments of error challenge the sufficiency of the evidence for each conviction. Applying the deferential standard of review and thus finding sufficient evidence to support these convictions, we affirm the judgment.

BACKGROUND

In September 2023, 17-year-old K.G.[1] lived with her grandmother Lori Wasden, who was her legal guardian, in Wasden's Pittsylvania County home. With K.G. and Wasden lived K.G.'s brother and K.G.'s boyfriend ("the boyfriend").

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] We identify this party by her initials to afford her privacy.

On the night of September 20, Gindlesberger visited his daughter K.G. at Wasden's home. Gindlesberger had recently moved to Virginia from California. Gindlesberger, K.G., the boyfriend, the brother, and the boyfriend's sister ("the sister") were "chilling" in K.G.'s bedroom. When a "conversation got brought up," things "got out of hand, almost immediately," according to K.G. She testified that the disagreement "got loud," prompting her to tell Gindlesberger "we're done" and to begin pushing him out of her bedroom. She told the court that Gindlesberger then pushed her back "in return."

As a result of the disagreement, Deputy Jerry Overstreet of the Pittsylvania County Sheriff's Office responded to a domestic disturbance call from Wasden's home. He wore his police uniform and displayed his badge. When he arrived, Overstreet saw K.G. in the driveway speaking with Deputy Joseph Eanes. K.G. was crying; she told Overstreet that Gindlesberger had assaulted her, the boyfriend, the sister, and Wasden. When asked where Gindlesberger was located, K.G. said that after she had locked him out of the house, he had reentered the house by going through the garage. She said that she then left the house when the officers arrived, at which point Gindlesberger had locked her out.

Deputies Overstreet and Eanes approached the front door of the house and spoke to Gindlesberger through the door. Overstreet testified that Gindlesberger told him that "he didn't want to talk to the police" and "wasn't going to open the door for" the officers. However, Wasden, the homeowner, gave them permission to enter the house.

Overstreet and Eanes testified that when Overstreet tried to step into the house, Gindlesberger began to shut the door on him. Consequently, Overstreet forced open the door so that he could assess the condition of the boyfriend and the sister and told Gindlesberger to get out of his way. Overstreet testified that "[a]t that point" Gindlesberger "bum-rushed and shoved" him with both hands, knocking Overstreet's body camera off of him. Overstreet

observed blood coming from open wounds on Gindlesberger's hands that left "a handprint of blood" on his uniform after Gindlesberger shoved him.

Eanes stood behind Overstreet during the conversation at the front door. He testified that Overstreet, having "re-opened" the front door as Gindlesberger started closing it, "came back towards" him suddenly. He saw Gindlesberger's "hand come up" toward Overstreet, though he did not see "exactly where on [Overstreet's] body [Gindlesberger] touched at."

Overstreet and Eanes began to arrest Gindlesberger. Eanes grabbed one arm while Overstreet grabbed the other, but Gindlesberger "somewhat tried to pull away from" them. The officers were trying to "get cuffs on to detain him," a process that Eanes approximates lasted for at least 30 seconds.

Earlier, while Overstreet and Eanes were speaking to Gindlesberger from the porch, a third officer, Deputy Larry Crews, arrived on scene wearing his body camera. The six-and-a-half-minute video and audio of Officer Crews' body camera were admitted into evidence. The footage opened with Overstreet, Eanes, and K.G. standing on the porch facing the open front door while Gindlesberger stood just inside facing the officers. Wasden was standing near him inside the house. Gindlesberger refused to allow the officers into the house, saying "you're not welcome in here." He told Overstreet, "My daughter is getting [expletive] raped."[2] Gindlesberger then pointed upstairs to K.G.'s bedroom and told the officers that the boyfriend was an "adult" and K.G. was not. He gestured to Wasden and said, "My mom is suffering from dementia." He explained that he just moved "out here" from California and that his daughter, K.G., "is being allowed to live in here with her boyfriend, who is over nineteen years old. . . .

---

[2] The trial court sustained Gindlesberger's objection that "statements from third parties on the video" not be admitted, but the court allowed "[s]tatements from the defendant in response to others" to be admitted. Consequently, we do not include statements by the officers, K.G., or Wasden in this summation of the body camera footage.

That's against the law. Period. That's rape." He told the officers that Wasden was not "of the right mind" to deal with the situation; the boyfriend "comes in here and . . . act[s] like he owns this property and my daughter."

The footage continues, and in reply to a question by an officer, Gindlesberger replied that the boyfriend was "upstairs right now. He's hiding up in there." Gindlesberger then called upstairs for the boyfriend to "come down here."

The officers continued to stand on the porch holding open the front screen door. Gindlesberger told Overstreet that he was not allowed inside and denied that the officer was given permission to enter. Though asked to move away from the door and further into the home, Gindlesberger grabbed the main front door and started to close it, telling the officers, "Do not enter this home. I'm telling you right now you're not allowed in this home." As he began to fully close the door, one of the officers warned him not to do so.

Overstreet put one foot into the house. Gindlesberger yelled to "get out of the house now." Gindlesberger asked for Overstreet's badge number as Overstreet demanded that he move out of his way and step back. Gindlesberger refused, saying, "No, what's your badge number," and Overstreet responded that this was the last time he will tell him to move. At this point, Eanes was behind Overstreet and blocked the view of Crews' camera. But Overstreet was heard telling Gindlesberger to put his hands behind his back and was seen to move suddenly backwards into Eanes while Gindlesberger went up to Overstreet with his hands raised. Overstreet then pushed Gindlesberger by the chest further into the house. Overstreet and Eanes grabbed his shoulders and started to try to handcuff him. But Gindlesberger refused to put his hands behind his back as ordered, pressing his fists together in front of his chest. Officer Crews joined the struggle as Gindlesberger continued his refusal to put his hands behind his back and continued to argue with the officers.

- 4 -

A fourth officer arrived as Overstreet and Eanes were still struggling to get Gindlesberger's hands behind him and to finish the handcuffing. Gindlesberger said, "You gonna try to twist my finger you [expletives]? Get out of the house now." A fifth officer arrived and joined Overstreet and Eanes in their ongoing struggle to handcuff Gindlesberger. Gindlesberger told them, "Cops, you need to leave now. Get the [expletive] out of here before you get hurt." More than two minutes after the initial order to put his hands behind his back, Officer Crews' body camera footage shows Gindlesberger still resisting the efforts of three officers to handcuff him. As an officer started to lead him toward the door and outside, he continued cursing and resisting and fell to the ground before finally being led out of the door. The footage ends.

Gindlesberger testified in his defense. He stated that K.G. told him that she was calling the police as a result of the disagreement in the bedroom. He testified that when Eanes arrived and asked to speak to K.G. and the boyfriend, Gindlesberger said, "okay that's fine," and "one by one" went upstairs to get everyone to come down, but K.G. interfered.

He further testified that Wasden owned the house and admitted that she authorized the officers to enter, though he "didn't think it was necessary." He claimed that he was concerned about Wasden's authorization due to what he alleged to be her dementia.

Gindlesberger testified that he did not "strike" or "hit" Overstreet. He stated that he "didn't put hands on [Overstreet] to shove him back." Gindlesberger testified that he was "being bombarded with people" and was "just trying to state that legally they didn't have the right to be doing that," and, further, that he had been cooperating with "all the other officers." He denied putting his hands on Overstreet prior to the commencement of the arrest. He admitted his hand was bleeding at the time and that "that's where the blood on [Overstreet's] uniform came from."

But he stated that, as "an auto mechanic, I have lots of cuts. A scab was knocked off of my wrist, in that frenzy." He said, "It wasn't from breaking into a house or breaking anything else."

On cross-examination, Gindlesberger admitted that his hands touched Overstreet's chest and that this contact with Overstreet was "the first thing that happened" when the officer entered the home. He stated that the reason he did not want the officers inside the house was because he was "fully cooperating" and the "dispute was being held outside."

At the close of the Commonwealth's evidence, Gindlesberger moved to strike all three charges. The court denied his motion to strike.

The trial court stated that it was a "shame" that Gindlesberger had refused admission to the officers because all he "had to do [wa]s let the officers in" to check on the boyfriend and the sister. The court found that Gindlesberger had "no right to push [K.G.] back" because she was not an aggressor and was trying to remove him from the increasingly hostile conversation in the bedroom. The court found that Overstreet did not enter the home until Wasden gave him permission to come in. Despite due authorization to enter, as Overstreet went in, Gindlesberger "pushed" him, as shown by the testimony about the bloody handprint on Overstreet's uniform and the detachment of his body cam, which Officer Crews can be seen picking up from the floor in the admitted footage. Gindlesberger "had no right to push" Overstreet as he proceeded with his investigation and "struggl[ed]" with the officers as they were arresting him, "definitely not cooperating." Accordingly, the court denied Gindlesberger's renewed motion to strike and found him guilty of the offenses of assault and battery of a police officer, assault and battery of a family member, and obstruction of justice. He was given an active sentence of seven months.

ANALYSIS

Gindlesberger challenges the sufficiency of the evidence used to convict him of the three offenses. "When presented with a sufficiency challenge on appeal, we review the evidence in

the 'light most favorable' to the Commonwealth." *Bowman v. Commonwealth*, 290 Va. 492, 494 (2015) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). "Viewing the record through this evidentiary prism requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Id.* (quoting *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015)). "In a criminal case appealed on sufficiency of the evidence grounds," we do not ask "'whether [we] believe[] that the evidence at the trial established guilt beyond a reasonable doubt'"; rather, we ask whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Commonwealth v. Moseley*, 293 Va. 455, 462-63 (2017) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). The trial court's "judgment is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Id.* at 463 (quoting Code § 8.01-680). This presumption applies with the same force in a bench trial as in a jury trial. *Id.* (quoting *Vasquez v. Commonwealth*, 291 Va. 232, 249 (2016)).

On appeal, the trial court's findings of fact "will not be disturbed unless plainly wrong or without evidence to support" them. *Commonwealth v. Holland*, ___ Va. ___, ___ (Jan. 16, 2025) (quoting *Jones v. Commonwealth*, 29 Va. App. 503, 512 (1999)). Additionally, "in reviewing a defendant's claim that a trial court unreasonably rejected h[is] hypothesis of innocence," we recognize that whether "'an alternative hypothesis of innocence is reasonable is a question of fact'" that binds us on appeal "'unless plainly wrong.'" *Maust v. Commonwealth*, 77 Va. App. 687, 700 (2023) (quoting *Wood v. Commonwealth*, 57 Va. App. 286, 306 (2010)).

A. Assault and Battery of a Police Officer

Gindlesberger contends that the evidence is not sufficient to convict him of assault and battery of Deputy Overstreet. He asserts that his contact with Overstreet can be "reasonably

interpreted as incidental contact resulting from an unanticipated use of force" by the officer in arresting him. He states that his hands made only incidental contact with Overstreet's chest, and only after Overstreet had "forced" his way into the house. Gindlesberger denies shoving Overstreet. Having allegedly "made clear" to the officers that he was trying to bring the boyfriend and the sister out to them, Gindlesberger argues that he was merely "exercising his perceived right to keep them out of his residence."

Code § 18.2-57(C) defines assault and battery of a police officer as "an assault and battery against another knowing or having reason to know that such other person is . . . a law-enforcement officer" who is "engaged in the performance of his public duties anywhere in the Commonwealth." *See also* Code § 18.2-57(H) (defining a law-enforcement officer as "any full-time or part-time employee of a police department or sheriff's office . . . who is responsible for the prevention or detection of crime and the enforcement of the penal . . . laws of the Commonwealth"). When the defendant does not contest that he knew the victim to be a law-enforcement officer, "the sole issue before us is whether the evidence supports the circuit court's determination that [the defendant] committed an assault and battery on" the officer. *Montague v. Commonwealth*, 278 Va. 532, 540 (2009).

"Assault and battery are common law crimes." *Id.* at 541. Though distinct criminal acts, they are linked under the statute, and the Commonwealth can prove the complete assault-and-battery crime "by proving a battery." *Blankenship v. Commonwealth*, 71 Va. App. 608, 620 (2020) (citing *Parish v. Commonwealth*, 56 Va. App. 324, 329 (2010)). "Because the statute does not define battery, we examine the common law definition." *Lopez v. Commonwealth*, 73 Va. App. 70, 83 (2021) (citing *Parish*, 56 Va. App. at 329).

The common law defines battery as the willful or unlawful touching of another. *Yellock v. Commonwealth*, 79 Va. App. 627, 641 (2024) (quoting *Parish*, 56 Va. App. at 330). The

actor's unlawful intent determines whether a touching rises to battery and is a question of fact for the factfinder. *Id.* (first quoting *Parish*, 56 Va. App. at 330; and then quoting *Cornell v. Commonwealth*, 76 Va. App. 17, 29 (2022)). Unlawful intent exists if the touching is an "objectively offensive or forcible contact with the victim's person resulting in some manifestation of a physical consequence or corporeal hurt," *Lopez*, 73 Va. App. at 84 (quoting *Adams v. Commonwealth*, 33 Va. App. 463, 468 (2000)), or done in a "rude, insolent, or angry manner," *Yellock*, 79 Va. App. at 641 (quoting *Kelley v. Commonwealth*, 69 Va. App. 617, 628 (2019)). Unlawful intent "may often be gathered from the conduct of the aggressor, viewed in the light of the attending circumstances." *Parish*, 56 Va. App. at 331 (quoting *Wood v. Commonwealth*, 149 Va. 401, 405 (1927)). For example, a person who shoves the victim in the chest and causes the victim to fall has committed an objectively offensive touching. *Lopez*, 73 Va. App. at 84.

Here, Gindlesberger testified that he knew that Overstreet, who was wearing his uniform, was a police officer. He also testified that K.G. had told him that she was calling the police, putting him on alert that officers might soon be on scene. Thus, Gindlesberger knew or had reason to know that Overstreet was an officer.

Additionally, we accept the trial court's findings that Wasden gave permission for the officers to enter the house but that Gindlesberger nonetheless "pushed" Overstreet as the latter tried to enter the home. These findings of fact are entitled to our deference because they have support in the record. Overstreet testified that Gindlesberger shoved him. Eanes testified that, standing behind Overstreet, he saw Gindlesberger's arms come up towards Overstreet at the same time that Overstreet came backward towards Eanes, providing circumstantial evidence of Gindlesberger's shove. Crews' body camera footage also shows what Eanes described. In light of this evidence, the trial court did not clearly err in rejecting Gindlesberger's story that he

accidentally touched Overstreet following the officer's forcible entry into the house. The court's finding that Gindlesberger intentionally shoved Overstreet is supported by evidence and not plainly erroneous.

Finally, the shove was objectively offensive because it caused Overstreet to stumble backwards into Eanes, imparted two bloody handprints onto Overstreet's uniform, and knocked Overstreet's body camera off of him. These were three physical consequences of the shove. Moreover, the circumstances surrounding the shove show that Gindlesberger stood obstinately at the door and for an extended period of time, refusing to let Overstreet inside to check on the boyfriend and the sister, despite the homeowner's authorization. The circumstances before and after the shove demonstrate that Gindlesberger was angry and uncooperative with the officers' lawful efforts to ascertain whether the boyfriend and the sister were safe. The evidence supports the finding that Gindlesberger shoved Overstreet with the requisite intent while knowing that he was an officer engaged in his public duties. Thus, the evidence is sufficient for a conviction on this offense.

## B. Assault and Battery of a Family Member

Gindlesberger argues that he should not have been convicted of assault and battery of K.G. due to the undisputed facts "establish[ing] self-defense as a matter of law." He notes that K.G. testified that she pushed Gindlesberger first. He contends that his pushing her back did not entail "any more force" than what was necessary to repel K.G.'s initial aggression.

Code § 18.2-57.2(A) defines the crime of assault and battery against a family or household member. Again, as the statute does not define battery, we turn to the common law. *See Marshall v. Commonwealth*, 69 Va. App. 648, 655 (2019) (citing *Carter v. Commonwealth*, 269 Va. 44, 46 (2005)). "An intentional touching qualifies as a battery unless the actor has some legal justification or excuse." *Woodson v. Commonwealth*, 74 Va. App. 685, 694 (2022).

- 10 -

Gindlesberger pleads that in pushing K.G., he acted in self-defense. Self-defense is ordinarily a question of fact. *Colas v. Tyree*, 302 Va. 17, 29 (2023) (noting that defense of others is commensurate with self-defense and that defense of others is "ordinarily a question of fact"). "In Virginia, self-defense includes both subjective and objective components. The defendant 'must have believed and must have had reasonable ground to believe, at the time [he acted], that he was in . . . danger.'" *See id.* (alterations in original) (quoting *Perkins v. Commonwealth*, 186 Va. 867, 877 (1947)).

Self-defense must be in response to a criminal act of violence by another. *See Bell v. Commonwealth*, 66 Va. App. 479, 487 (2016). Self-defense may be either justified, meaning the defendant was without fault "in provoking or bringing on the difficulty," or excused, meaning that the defendant was at fault in bringing about the difficulty but he retreated "as far as possible," announced his "desire for peace," and only committed the act for which he pleads self-defense "from a reasonably apparent necessity to preserve his own life or save himself from great bodily harm." *Id.* (citations omitted).

Sufficient evidence supports the trial court's conclusion that Gindlesberger battered his daughter without justification or excuse. The trial court credited the testimony of K.G., who asserted that she, her brother, the boyfriend, the sister, and Gindlesberger were in her room "chilling out" until the conversation "got out of hand" and she "pushed" Gindlesberger out. The court found that Gindlesberger then "push[ed] her back," which he had "no right" to do since K.G. was not "an aggressor" and was trying to "remove" Gindlesberger from a conversation that was getting out of hand. The testimony establishes that Gindlesberger was visiting K.G. at her residence—the home of Wasden, her legal guardian—and that the conversation took place in her bedroom there. Gindlesberger was not a resident of the home and was simply visiting K.G. Moreover, Officer Crews' body camera footage demonstrates that Gindlesberger was angry at

the presence of the boyfriend in the house. K.G. testified that she tried to "defer" the escalating conflict in the bedroom and that she pushed him "once things got loud" and after she told him that "we're done." Based on these facts, the trial court's finding that Gindlesberger shoved his daughter, K.G., prior to the arrival of the officers is not plainly erroneous.

Additionally, the trial court's conclusion that Gindlesberger did not have the right to push K.G. back is correct. Gindlesberger was in her bedroom and ignored K.G.'s efforts to remove him from the situation when things began to get out of hand. Her action was not a criminal act of violence because she had the right to insist that he leave her bedroom, especially since he was contributing to conflict while inside of it.

Even if K.G.'s initial push was a criminal act, Gindlesberger's responsive shove is not justified or excused under self-defense. He was at least slightly at fault because he was a cause of the rising tension in the bedroom conversation. Thus, he was at least partially to blame for "provoking or bringing on the difficulty," *see Bell*, 66 Va. at 487, so his act is not justified. Nor is his act excused, since under excusable self-defense he had a duty to retreat as far as possible, to announce his peaceable desires, and to both believe and have reasonable grounds to believe that he was in danger from K.G. *See id.*; *Colas*, 302 Va. at 29. But the testimony does not establish that he retreated once K.G. tried to remove him from her room, which he could have done. Nor did he announce any peaceable intentions. His later conduct after the officers arrived, especially his anger at the boyfriend, suggests the opposite. And he did not have reasonable grounds to assume that K.G. was putting him in danger. He simply should have left the room. Accordingly, the trial court's implicit finding against self-defense is supported by evidence. We affirm the conviction.

C. Obstruction of Justice

Gindlesberger contends that his conviction for obstruction of justice is error because he was trying to help the officers and did not impair their investigation. He asserts that he was "trying to assist the officers' demands by bringing out any witnesses they would care to question." Gindlesberger also argues that he had "at minimum a perceived right to keep [the officers] out of his residence." He states that he had a right to deny the police entry since a homeowner may deny entry to an officer who lacks a warrant or, alternatively, that he "had no reason to believe that the officers had been authorized to make entry into his residence." He asserts that *Maldonado v. Commonwealth*, 70 Va. App. 554 (2019), controls.

Obstruction of justice occurs when someone, "by threats or force, knowingly attempts to intimidate or impede . . . any law-enforcement officer, . . . lawfully engaged in his duties as such." Code § 18.2-460(B). The two elements of the offense are knowingly attempting to impede an officer and using threats or force. *Hamilton v. Commonwealth*, 69 Va. App. 176, 196 (2018). The intent requirement is the "intent to impede a police officer in the performance of his duties" and may be proven by the defendant's "statements or conduct." *Id.* (quoting *Woodson v. Commonwealth*, 14 Va. App. 787, 795 (1992)). The force requirement is the use of "[p]ower, violence, or pressure directed against a person or thing." *Id.* (alteration in original) (citation omitted).

Here, there is abundant evidence to support Gindlesberger's conviction for obstructing the officers. His reliance on *Maldonado* is misplaced because there, the court declined to extend the offense of obstruction to a homeowner's "refus[al] to admit law enforcement officers who lack either an arrest warrant or search warrant to one's home to further an investigation." 70 Va. App. at 566. Gindlesberger is not the homeowner; the police obtained the true homeowner's consent to enter the home. He further relies on *Maldonado* to argue that "actions that merely

- 13 -

frustrate a police officer's investigation, but do not 'oppose, impede, or resist' an officer's lawful efforts to conduct an investigation, do not constitute obstruction of justice as contemplated by Code § 18.2-460(A)." *Id.* at 569-70 (citing *Ruckman v. Commonwealth*, 28 Va. App. 428, 431 (1998)). But *Maldonado* concerned a different subsection of the obstruction of justice statute. *Id.* (analyzing Code § 18.2-460(A)). Consequently, its analysis of what it means to "oppose, impede, or resist" does not apply to the present case.

Here, Gindlesberger's statement that he was trying to assist the officers in their investigation is contradicted by the same testimony and by the camera footage. The trial court was not plainly wrong in rejecting Gindlesberger's proffered theory of innocence in which he argues that he was assisting the officers in their investigation. He was not. And, as explained above, we must accept as true the trial court's finding that Gindlesberger shoved Overstreet as the officer tried to enter. Gindlesberger's battery clearly shows his intent to impede Officer Overstreet and his use of force in doing so. We thus find sufficient evidence to support his conviction on the obstruction of justice charge and affirm.

CONCLUSION

For the above-stated reasons, we affirm Gindlesberger's convictions for assault and battery of a police officer, assault and battery of a family member, and obstruction of justice.

*Affirmed*.